BAYNE *v.* EVERHAM.

1. NEGLIGENCE—COLLAPSE OF BUILDING—EVIDENCE—QUESTION FOR JURY.

> In an action against the owner of a building, the contractor, and a materialman to recover for the negligent death of plaintiff's intestate due to the collapse of a portion of the upper floor of a concrete building during its construction, where the evidence was conflicting, it was a question for the jury whether the design of the concrete beams furnished by the materialman were insufficient, and the floor likely to collapse.

2. SAME.

> Evidence *held*, sufficient to show that the upper floor of the building was not constructed according to the plans and specifications.

3. TRIAL—INSTRUCTIONS.

> An instruction that it was the duty of the materialman to use due care to furnish reasonably safe and accurate designs, plans, and specifications and to describe in detail the necessary and proper sizes and dimensions of the beams, panels and columns used in the construction of the building so that they would hold the required weight and to specify proper steel bars and rods to be used in anchorage, was incorrect.

4. NEGLIGENCE — RESPONSIBILITY OF ARCHITECT — DEFECTIVE MATERIAL.

> The responsibility of an architect does not differ from that of a lawyer or physician, and he does all the law requires, when he possesses the requisite skill and knowledge, if he uses his best judgment in the exercise of such knowledge.

5. SAME—DEATH—ASSUMPTION OF RISK — CONTRIBUTORY NEGLIGENCE—INSTRUCTIONS—QUESTION FOR JURY.

> In an action against the owner of a reinforced concrete building, the contractor, and a materialman furnishing material and architects' plans for the concrete work, for the

death of a carpenter due to the collapse of a portion of the upper floor of the building which plaintiff's decedent and others were attempting to shore up to prevent it from falling, *held*, that the questions of assumption of risk and of contributory negligence were for the jury under proper instructions.

6. INDEPENDENT CONTRACTOR—DEFINITION.

A person who furnishes an estimate of the cost of the construction of a building and agrees to oversee the work for a certain percentage of the cost, to furnish equipment and machinery and to pay for the hauling of the same away upon completion of the work, and is to have the lumber used in the work, is an independent contractor.

7. SAME.

A company which furnishes plans and specifications and reinforcing steel for a reinforced concrete building is an independent contractor.[1]

8. APPEAL AND ERROR—INSTRUCTIONS—INCONSISTENT INSTRUCTIONS.

In an action against the owner of a building, the contractor and a materialman furnishing plans and specifications and material to recover for the death of a carpenter due to the fall of a portion of the upper floor, an instruction that the materialman was an independent contractor was inconsistent with one that it was the duty of the owner to furnish plans and specifications.

9. SAME—INCONSISTENT INSTRUCTIONS—PRESUMPTIONS.

Where a charge contains two conflicting portions, one of which is correct and the other incorrect, it will be presumed on appeal that the jury followed the erroneous portion.

10. SAME—INSTRUCTIONS.

In an action against the owner of a building, the contractor, and a materialman furnishing material and plans, for the death of a carpenter due to the collapse of a portion of the upper floor of the building, an instruction that if the jury believed from the evidence that the owner let the contract to different contractors and during the progress of the work reserved to himself certain control over

---

[1]The question as to who is an independent contractor is discussed in notes in 65 L. R. A. 461; 17 L. R. A. (N. S.) 372.

the manner of executing the work and assumed control, in whole or in part, of the work, and by reason of such control the death of deceased was caused without any fault upon his part, the owner was liable, was improper, where the only evidence as to assumption of control related to another portion of the building.

Error to Wayne; Cross, J., presiding. Submitted April 19, 1917. (Docket No. 124.) Decided July 26, 1917. ·

Case by James H. Bayne, administrator of the estate of Leo La Framboise, deceased, against Melville B. Everham, Thomas F. Cowhey, the Gabriel Reinforcement Company and William W. De Lange for the negligent killing of plaintiff's intestate. Judgment for plaintiff. Defendants Cowhey and Gabriel Reinforcement Company bring error. Reversed.

*Alexander J. Groesbeck* and *Guy A. Miller,* for appellant Cowhey.

*Chamberlain, Denby, Webster & Kennedy,* for appellant Gabriel Reinforcement Company.

*Washington I. Robinson,* for appellee.

STONE, J. This is an action to recover damages for the negligent killing of plaintiff's intestate by the collapse, while under construction, of a portion of a reinforced concrete garage upon which he was employed as a carpenter in making and setting up forms and shoring, used in connection with the concrete work.

The defendant Cowhey was the owner of the premises, and, being desirous of erecting a garage upon it, he hired an architect named Molby to draw plans and specifications for such building.

The defendant Gabriel Reinforcement Company was

in the business of selling reinforcing steel for concrete construction work. It furnished the reinforcing steel for this building amounting to between $1,400 and $1,500, and was paid for the same by Cowhey's check. Defendant De Lange was its manager. Defendant Everham was the contractor.

From a verdict and judgment for $7,500 against defendants Everham, Cowhey, and Gabriel Reinforcement Company, the last-named two defendants have appealed. Defendant Everham has not appealed, and a verdict was directed in favor of defendant De Lange.

The building where deceased lost his life is located on the north side of Larned Street, East, in the city of Detroit, on a lot 70 feet by 120 feet, which runs back to an alley parallel with the street. The building covered the entire lot. After consultation with the architect, Molby, and after consultation with the defendant De Lange, defendant Cowhey concluded to use the Gabriel system of reinforced concrete construction. Plans for the concrete work, specifying the amount, kind, and placing of reinforcing rods, the size and location of beams and columns, and the kind of floor construction were prepared by the Gabriel Reinforcement Company and delivered by it to Mr. Cowhey, These plans were introduced in evidence as Exhibit 2. Tracings and a blueprint showing the part of the building which collapsed are hereto attached. Both the architect's plans and the steel reinforcement plans were submitted to the department of buildings of the city of Detroit. After being in the possession of the department for some days, they were approved and returned to Mr. Cowhey. No claim of negligence was made against defendant Cowhey in connection with the employment of either the architect or the Gabriel Company. After the form of construction was determined upon defendant Cowhey made the following contract with defendant Everham:

"M. B. EVERHAM,
"Successor to
"HANNEMAN EVERHAM CO.,
"Contractors,
"Reinforced Concrete Structures,
"DETROIT, MICH.
"Office:   707 Chamber of Commerce.
"Phone Cherry 223.
·   "Aug. 14, 1912.
"MR. THOMAS E. COWHEY,
"309 Jefferson Ave.,
"Detroit, Mich.
"*Dear Sir:*   I beg to submit this proposal for furnishing machinery and tools to build the following work in your garage building to be erected in East Larned St. near Antoine:

"Reinforced crete.   .

"Concrete walls.

"Concrete floors (first floor and basement).

"Second floor cement finish.

"Cinder fill on roof and cement finish.

"This work includes no steel or iron work except reinforcing steel.   No sidewalks are included.

"I estimate the cost of material and labor to complete the above work to be $9,700.00, exclusive of my charge for doing the work.   On this estimated cost you are to pay me 3 per cent. or $291.00, for the use of my machinery and equipment and for my supervision of the work.

"My estimate of $9,700.00 as the cost of this work is based on making the walls four (4) feet deep below first floor except at basement.   You are to pay for all material and labor required in the work, including one civil engineer superintendent.   You are to pay all hauling charges of my machinery and equipment, and such lumber as I have, to the work.   I will pay for hauling my machinery and equipment away from the work.

"I will furnish without cost to you such lumber and plank as I have on hand (except the hauling) and all the lumber bought and used and resulting from the above-mentioned work shall belong to me.   I will pay for hauling lumber away from the work.

"If the final cost of this work should exceed my estimate of $9,700.00, exclusive of my fee, I agree

that one-half of such excess shall be deducted from my fee of $291.00 and if one-half of excess cost should be $291.00 or more I am to get nothing for my supervision of the work or the use of my machinery and equipment, except that I am to get the lumber resulting from the work, and I am not to be held for more than $291.00 of excess cost.

"If I succeed in reducing the cost below my estimate of $9,700.00 you are to pay me one-half of such saving or reduction in cost in addition to the 3 per cent. on estimated cost of $9,700.00, and I am also to have the lumber used in and resulting from the work.

"Respectfully,

"M. B. EVERHAM."

The following is in the handwriting of Thomas E. Cowhey:

"Party of the second part agrees to complete said work by the 10th of October unless he is obstructed by some unforeseen obstacle that is not any fault of his.

"THOMAS E. COWHEY,

"M. B. EVERHAM."

Everham was a man of considerable experience, and it is not claimed that defendant Cowhey was negligent in contracting with him for this work. Some description of the construction will aid in understanding the situation.

The building to be erected was a two-story structure, with a roof so designed that at some future time it could be used as a floor. In the testimony upon the trial this was referred to mostly as the third floor, but sometimes as the roof. The reinforcement consisted of bars, rods, and wires designed and sold by the Gabriel Company, whose sizes and locations were prescribed by the plan Exhibit 2. The entire weight of the structure was carried by a series of concrete columns, connected by concrete beams. The latter carried the weight of the floor slabs and the load supported

thereby into the columns. The clear height of the first story was about 14 feet from the floor to the bottom of the beams carrying the second floor, the collapse of a part of which caused the deceased's death. This floor was supported by a series of transverse beams, labeled "A" and "B" on the plans, which rested at their outer ends on concrete columns, and at the center line of the building on a series of similar columns. The clear span of these beams was about 32 feet, and they were 17 feet apart north and south. None of these beams fell. The columns at the outer ends of the beams were connected by beams called lintel beams, which carried the curtain walls of brick forming the east, west, and north walls, and which were labeled "L1," "L2," etc. The floor spaces between the transverse beams, and referred to as panels, were about 17 feet span from beam to beam, and were what is known as tile and concrete construction. In this construction hollow tile 6"x 12"x12" are laid, end to end, in parallel lines, flat side down, perpendicular to the supporting beams, and the rows 4 inches apart. Between the rows of tile reinforcing rods are placed, which run at each end into the supporting beams, and help to support the floor. These beams are filled with concrete, and concrete 2 inches deep is poured over the top of the tile, which is merely a filler. At the northwest corner, where the accident occurred, the plans called for an elevator opening, and this necessitated the use of beams of different sizes. Beams "E" and "F" which ran north and south, from the rear wall to columns 10 and 17, respectively, were designed to be about 16' 3" span, and of the size indicated in the schedule attached to the plan. Beams "C" and "D" ran parallel to the rear wall, the former resting upon columns 10 and 17 at the south ends of "E" and "F," and "D" rested upon "E" and "F" at points between 3 and 4 feet from the rear wall.

The testimony of the experts indicated that "D" and

"F" were the weakest beams, and that the weakest point was where "D" joined "F." This was the point

where the structure failed. Beam "F" in its fall carried with it "C," "D," and "E," the floor panel bound-

Note: Across beams A, B, & C in top of floor slab. are to be placed ¼" top bars 32" d ¢ marked "P50"

| BEAMS | | | STEEL | | | | | |
|---|---|---|---|---|---|---|---|---|
| LTR | NO | SIZE | PCS | SIZE | LENGTH | LOOP | MARK | Tee Sect |
| A | 10 | 16/26 | 4 | 1¼" | 34-8 | 22x11 | P1 | 36" |
| | | | 2 | 1½" | 42-0 | | P2 | |
| B | 1 | 16/26 | 4 | 1½" | 33-6 | 22x11 | P3 | 36" |
| | | | 2 | 1½" | 41-0 | | P4 | |
| C | 1 | 10/16 | 3 | ⅞" | 17-0 | 12x6 | P5 | 24" |
| | | | 1 | 13/16" | 24-8 | | P6 | |
| D | 1 | 8/12 | 2 | 13/16" | 17-0 | 8x5 | P7 | |
| | | | 1 | ¾" | 17-8 | | P8 | |
| E | 1 | 8/14 | 2 | ⅜" | 17-2 | 10x5 | P9 | 18" |
| | | | 1 | ⅝" | 17-10 | | P10 | |
| F | 1 | 8/14 | 2 | 13/16" | 17-2 | 10x5 | P11 | |
| | | | 1 | ⅞" | 17-10 | | P12 | |
| L1 | 10 | 8/14 | 2 | ¾" | 17-2 | 10x5 | P13 | |
| | | | 1 | ⅝" | 24-8 | | P14 | |
| L2 | 4 | 8/14 | 2 | ⅝" | 16-3 | 10x5 | P15 | |
| | | | 1 | ⅝" | 20-0 | | P16 | |
| L3 | 1 | 10/32 | 2 | ½" | 13-9 | 28x14 | P17 | |
| | | | 1 | ⅜" | 17-8 | | P18 | |
| L4 | 1 | 10/32 | 2 | ½" | 17-0 | 28x14 | P19 | |
| | | | 2 | ⅜" | 23-8 | | P20 | |
| L5 | 1 | 10/32 | 2 | ⅝" | 17-0 | 28x14 | P21 | |
| | | | 1 | ⅝" | 24-4 | | P22 | |
| L6 | 1 | 10/32 | 2 | ⅝" | 17-2 | 28x14 | P23 | |
| | | | 1 | ⅝" | 21-3 | | P24 | |
| L7 | 2 | 8/33 | 2 | ½" | 5-2 | 29x15 | P25 | |
| L8 | 3 | 8/33 | 2 | ⅝" | 13-1 | 29x15 | P27 | |
| | | | 1 | ⅝" | 14-1 | | P28 | |
| G | 2 | 9/12 | 2 | ⅞" | 16-0 | 8x5 | P41 | |
| | | | 1 | ⅝" | 16-6 | | P42 | |
| H | 1 | 8/10 | 2 | ¾" | 16-0 | 6x5 | P26 | |

| | FLOOR STEEL | | | | |
|---|---|---|---|---|---|
| PCS | SIZE | LENGTH | LOOP | MARK | |
| 2 | ⅝ | 26-0 | 6x5 | P29 | |
| 8 | ⅝ | 15-0 | 6x5 | P30 | |
| 117 | ⅝ | 17-2 | 6x5 | P31 | |
| 104 | ¾ | 17-2 | 6x5 | P32 | |
| 12 | ¾ | 17-2 | 10x5 | P33 | |
| 6 | ⅝ | 7-0 | — | P34 | |
| 8 | ⅝ | 4-0 | — | P35 | |
| 12 | ⅝ | 13-8 | 6x5 | P36 | |
| 3 | ⅝ | 5-0 | — | P37 | |
| 12 | ¾ | 16-7 | 6x5 | P39 | |
| 11 | ¾ | 16-7 | 6x5 | R39 | |
| 20 | ⅝ | 15-8 | 6x5 | P40 | |
| 20 | ¾ | 15-8 | 6x5 | P43 | |
| 2 | ⅜ | 6-8 | | P44 | |
| 1 | ½ | 8-6 | — | P45 | |
| 2 | ½ | 6-0 | — | P46 | |
| 2 | ½ | 4-0 | — | P47 | |
| 12 | ⅝ | 12-0 | — | P48 | |
| 30 | ⅜ | 4-11 | — | P44 | |
| 118 | ½ | 7-0 | — | P50 | |

*Includes Stirrups for 3'-6"x 6'-0 pit.*

*Section A-A*
*Scale: ½"=1'-0"*

*2'concrete.*

P-32   P-31   S-P33   3-6"   3'

⅜" Stirrup P49 6"¢¢

| COLUMN | | SCHEDULE | | | | |
|---|---|---|---|---|---|---|
| Col. Nos. | 2 To 7 20 To 24 | 1 & 18 | 10 to 15 | 8-9-19 | 17 | 16 |
| No of Cols | 11 | 2 | 6 | 3 | 1 | 1 |
| SIZE | 12x18 | 10x18 | 18x18 | 10x18 | 14x14 | 10x24 |
| STEEL | 8-1¾" 5½-12¢ | 8-⅝" ¼-12¢ | 8-1" ⅜-5P | 8-⅝ ¼-12¢ | 6-⅞ ¼-4B | 8-⅝ ¼-12¢ |

GABRIEL REINFORCEMENT CO.
PENOBSCOT BLDG. DETROIT, MICH.
COWHEY GARAGE
2nd Floor
Date. 8-26-1912 Scale: ⅓ =1'-0"
Made by M
Traced by
Checked by
Approved by   Contract No. 1722
Drawing No. 2

ed by those four beams, the part of the floor west of "F," and a part of the panel south of "C."

The beams here in question had been poured six weeks, and the shoring had not all been removed. It is the claim of the defendant Cowhey that there was no negligence in removing the shoring, and that no injury could have resulted if the plans had been proper and had been followed, and if the concrete had been properly mixed in proportions prescribed in the specifications. The defendant Gabriel Company claims that the plans were proper, but that there was no evidence that they were followed either in the mixture of concrete or in the placing of the steel. All parties agree that the placing of the steel reinforcement, the design of the same, and the quality of the concrete are of the greatest importance in such work.

Work was begun by defendant Everham about August 15, 1912. It will be noted that the contract provides that:

"You [meaning Cowhey] are to pay for all material and labor required in the work including one civil engineer superintendent."

To fill this place Everham hired a man named Johnson. Together they laid out the building, starting at the front and marking the positions of the side and center columns, which were 17 feet 2 inches from center to center. When the rear panel was reached, it was found that the lot was 6 inches over 120 feet in length, and to cover the whole lot 6 inches were added to the rear panel, which had the effect of lengthening the beams "E" and "F," without lengthening the steel reinforcing rods. It is undisputed that this reduced the anchorage of the rods in the columns, and reduced the strength of the beams. Defendant Everham took charge of the job, built a shed for his tools, had his concrete mixer and hoisting engine brought to the job, and put up his sign. The machinery was placed and installed by Johnson and one John Deppert, who at first worked as engineer, a part of the time as carpenter, and who became foreman after Johnson left on November 2d. After the foundations were in defendant Everham left Johnson in active charge of the work. Everham was on the job sometimes every day, sometimes four or five times a week, to see how Johnson was getting along, and how the work progressed; he did not give orders as to the way the work was done, but relied entirely on Johnson.

After the foundations were completed, the forms for the columns and the second floor beams and floor panels were put in place. The second floor was poured in sections, the middle part of the building first, then the rear end, including that part that later fell, and last the front panels. The pouring of the front panels

was finished October 15th. There being but one hoist and one mixer, the work could not have been completed in one operation. The shoring remained under the beams and panels for from ten days to two weeks, when a part was taken out, and they were reshored so that there were three shores under each of the long transverse beams, one under "C," "D," "E," and "F," and some shores under the floor panels. All this was done under Johnson's supervision.

After the second floor was reshored, the forms, centering and shoring for the third floor were put in place. Those for the rear two-thirds of the building were first placed, and the concrete for that part was poured first. While this work was in progress Johnson quit on November 2d. On Monday, November 4th, John Deppert took charge as foreman. Johnson had been called superintendent. Just how this change was brought about is quite vague in the evidence. Upon this change practically the entire charge of the negligence on the defendant Cowhey's part is based, a charge which he claims finds no support in the evidence. Deppert continued the work of placing the steel for the third floor subject to Everham's instructions and to the directions of De Lange, manager of the Gabriel Company. In this work it is the claim of defendant Cowhey that Deppert received no instructions from him. Deppert also so testified.

When the steel was in place for all except the front 40 feet of the third floor, the operation of pouring the concrete began. On November 15, 1912, when about one more bucket of concrete was needed to finish the third floor, and the part in the rear resting on the beams "C," "D," "E," and "F" had just been poured, the man in charge of the hoisting engine noticed that the shoring under "F," near its intersection with "D," was bending. He called Deppert, who was on the third floor. When the latter saw the condition

of the shoring he called the carpenters, who at the time were at work on the second floor erecting forms and shoring for the front 40 feet of the third floor, ordered them to bring shores and wedges from the second floor and from the first floor, and went under the beam in question on the first floor to shore it up. Five carpenters and several laborers were at work trying to shore up beam "F." While they were working with great speed to get the shores in place, a quantity of concrete, about a bushel or more, fell from the bottom of the beam, exposing the reinforcement rods. The men looked at the beam after this fall, decided it was safe to go under the beam, returned to their work, and kept on working faster than before. When they had four or five shores in place, and were raising another, the second floor gave way above them, and in its fall brought down the newly-poured concrete above it. Deceased and two or three others were caught and killed, and several others were injured.

The evidence shows that Deppert had had nothing to do with the concrete work or the shoring under the second floor; his work was confined to the third floor, and the only effect of his operations lay in the added weight of wet concrete put upon the second floor. This weight amounted to about 25,000 pounds on the floor that fell. The portion which collapsed covered an area at the northwest corner of the building of about 285 square feet. The remainder of the building stands, and is in use as originally constructed.

Plaintiff's claim of negligence against the defendants is based upon three propositions:

(*a*) That the portion of the second floor which collapsed was not properly "shored" up.

(*b*) The concrete used in the construction of the second floor was improper.

(*c*) The concrete plans were improper and insufficient.

In disposing of the case, we think it necessary to treat the claims of defendant Gabriel Company and defendant Cowhey separately, as their claims are in some instances antagonistic.

Manifestly the Gabriel Company had nothing to do with the shoring, or the mixing of the concrete, and plaintiff's claim of negligence as against the Gabriel Company rests only on the concrete plans. There was a sharp conflict in the testimony of the experts who testified regarding the design. The plaintiff produced Mr. Yokum, and defendant Cowhey Mr. Adams, and both testified that in their opinions the design of the beams which collapsed was insufficient, Mr. Yokum testifying that the weakest beam was stressed to the breaking point, and Mr. Adams that beams "E" and "F" would not have carried the dead and live load which they were supposed to carry, and in his opinion the building would be sure to fall down if constructed according to plans.

The Gabriel Company called as an expert Julius Kahn, an expert of large experience and conceded ability in his profession. Mr. Kahn made a personal examination of the portion of the building which collapsed, and figured in detail the stresses and strains on the beams, etc. He testified that, while not in accordance with the building code, it was such a design as first-class engineers might submit, and that, in his opinion, the design had nothing to do with the collapse, saying: "I am absolutely satisfied it did not." Such was the sharp conflict of expert opinion. Here undoubtedly was a question of fact. It is the further contention of the defendant Gabriel Company, and in this we think it is correct, that there was no evidence that the second floor was constructed according to plans and specifications. We have examined the record carefully, and it may be said that the plaintiff produced no testimony of any kind to prove that the

building was actually or substantially built according to the design.

Defendant Everham was called to the stand by plaintiff, and in the course of his examination identified the concrete plans as having been on the job in the possession of Johnson; and while it is true that he answered "Yes" to a general question to the effect that, in so far as he was able to see, the work was being done properly and according to plans and specifications, when his attention was challenged to this on cross-examination, he then stated several times that he did not know whether the building was constructed according to the concrete plans or not. He did not know the proportions in the mixture of concrete. He did not know the size of the beams, the placement of steel, or any of the details of the construction work. Everham testified that it would not be in his province to find fault with Johnson's work, he stating that it was a part of the second floor which collapsed, and that Johnson knew all about its construction; and he testified repeatedly that he knew nothing about it. Johnson was not called as a witness in the case. Neither defendant Cowhey, the owner, nor any of the workmen produced as witnesses testified that the building was constructed according to plans and specifications, and it is urged that naturally they would not be able to testify regarding such matters.

It is urged by said defendant that, not only is the record barren in this respect, but, on the other hand, there was most convincing evidence that the plans and specifications were deviated from in respects which were of necessity vital.

1. The specifications called for concrete one part of cement, two of sand and four of gravel, called in the record the "1, 2, 4 mixture." The plaintiff produced the witness Holsenbeck, who ran the mixer, and there is no contradiction of his testimony in the record. He

stated that the mixture was one part of cement to eight parts of gravel at the minimum. It was probably a much leaner mixture. The plaintiff's expert witness characterized this mixture as "ridiculous," estimating it to be somewhere around half as strong as the specifications called for. Mr. Adams gave substantially the same opinion, while Mr. Stoddard, from the testing laboratory, said it would not be over one-quarter as strong. The gravel used contained an excess of sand, which weakened the mixture, and actual tests for compressive strength of the very concrete involved in the failure showed 474 pounds per square inch to 589 pounds, while, if properly mixed (1, 2, 4 mixture), the compressive strength would have been 2,200 to 2,400 pounds and over at the time of failure. In fact, there may be said to be a seeming unanimity in the testimony regarding the poor quality of the concrete used. The opinion of the experts, the tests made in the laboratory, as well as the evidence of the man who mixed it, show conclusively that the concrete was, in fact, only from one-quarter to one-half as strong as it should have been, if mixed in the proportions called for in the specifications.

2. The testimony also showed, without dispute, that the building itself was six inches longer than the plans called for; and defendant Everham, the only witness who testified on the subject, stated that the whole of the additional six inches was accounted for by lengthening the last panel, which was the one that failed. The attention of the Gabriel Company was not called to this surplus of length, and the reinforcing bars were not lengthened out to correspond. The witness said that Johnson was to attend to this, and he also stated that he did not think this was done. It is apparent that the effect of lengthening out this panel was to decrease the amount of anchorage and materially weaken the beams.

3. It is also uncontradicted that steel was omitted. The witness Deppert testified, and in this he was uncontradicted, that certain pieces of steel intended for use in the second floor were found on the job after all of the second floor had been poured. He testified:

"It was in the way, and we piled it up close to the brick wall in the front part of the building."

Mr. Kahn testified that he had made a careful examination of the beams and columns of the building after the collapse. It was poured as a monolithic mass, and by examining the perforations in the columns he could determine the number of steel rods in each beam, and also just where the bars were placed, i. e., distance from top to bottom. He testified that beam "E" called for three bars according to the plan, but only two bars were placed therein. In beam "F" the continuity bar was omitted. The cantilever bar was omitted in "L2." He testified that this "materially decreased the efficiency of the beam," and, in his opinion, was one of the causes of the failure of the building.

4. Steel misplaced. By the same method Mr. Kahn testified that he was enabled to determine that steel bars had been badly misplaced in beam "F"; that a steel bar, if intended to act in compression, must be placed near the top of the beam; if for tension, near the bottom; and that a deviation from its proper placement materially reduced its effectiveness. He testified that the distance from the top bar to the bottom should have been 12 inches; actually it was only 7 inches, "reducing the effectiveness of the beam at that place pretty near 50 per cent." This testimony relates to the beam claimed to have been the first to fail, and is not contradicted on the record.

The Gabriel Company moved for a directed verdict at the close of the evidence, and the grounds covered the foregoing as well as other points. It also pre-

sented requests to charge along the same line.   The
trial judge overruled the motion, refused the requests,
and submitted the case to the jury.   In so doing the
court left to the jury to determine whether the plans
had been substantially followed, and charged that it
was the duty of the Gabriel Company to furnish prop-
er and sufficient plans.

It is strenuously urged by the Gabriel Company in
support of appropriate assignments of error that an
engineer or architect cannot be held responsible for
the collapse of a building, unless his plans have been
substantially followed.   It is urged that there is no
testimony showing that the concrete plans were ac-
tually followed, or substantially followed, in the con-
struction of the portion of the building which actually
fell; that, on the contrary, the testimony shows that
the plans and specifications were deviated from in
material and vital respects which might, and probably
did, cause the collapse.   It is urged that it is element-
ary in principle to say that the plaintiff must show
(1) not only defective plans, but also (2) that those
defective plans were put into execution, causing (3)
the collapse of the structure, and that, if plaintiff sup-
plies proof of (1) and (3), ignoring (2), he does not
make a case; that plans may be defective and a build-
ing collapse, but the connecting link between cause
and effect remains to be supplied; and that Johnson,
the superintendent who actually constructed the sec-
ond floor, knew all about it, but was not produced as
a witness, and no other witnesses were called to sup-
ply this evidence.

Counsel for the Gabriel Company called attention
to *Lake* v. *McElfatrick,* 139 N. Y. 349 (34 N. E. 922).
In that case damages were sought against an archi-
tect for defective plans and specifications furnished
by him for the erection of a theater building.   The
sole defect complained of was in the plan of the pro-

scenium arch. This was designed to rest upon what is known as stone skewbacks. Their office was to furnish a firm foundation for the arch, and distribute its thrust over a large area of the abutments. Instead of using stone skewbacks, brick was substituted. The trial court permitted the plaintiff to recover, and the supreme court affirmed the judgment of the trial court. The court of appeals, however, held that plaintiff's complaint should have been dismissed upon the ground of a failure to prove that the arch was built in substantial compliance with the plans and specifications furnished by the defendants. The court said:

"The trial judge held that there was sufficient evidence to support a finding that the arch fell on account of the omission of the stone skewbacks, and he submitted that question to the jury, with the instruction that if they so found the plaintiff should not recover. But we think it was error to submit this question to the decision of the jury. When it was conceded that the plaintiff's assignor had not followed the plans in this respect, and it appeared that the failure to put in the stone skewbacks may have caused the loss, which the plaintiff is seeking to impose upon the defendants, they were entitled to a ruling as a matter of law that the plaintiff could not recover, and the complaint should have been dismissed. * * * It is not necessary to hold that a literal performance of the condition was required. A variance, confessedly immaterial, or a departure from the plans in a separate and independent part of the building, having no structural relation to the defective member, would present a different case for our consideration. But where the variance is not disputed, and involves the integrity of the mode of construction of the affected part, and is so far material that it may have been the direct cause of the injury for which the owner seeks to hold the architect responsible, it must be held, we think, that the plaintiff has failed to establish the cause of action upon which he relies."

To the same effect see, also, *Clark* v. *Pope,* 70 Ill. 128, 132.

It is also urged, and we think with much force, that the court erred in its charge to the jury covering the duties of the Gabriel Reinforcement Company with reference to the so-called concrete plans. Among other things, the court charged the jury as follows:

"It was the duty of the said Gabriel Reinforcement Company to use due, proper, and reasonable care and caution and prudence to furnish reasonable, safe, proper, and accurate designs, plans, drawings, and specifications, which plans, drawings, and specifications should have contained the proper, necessary, and practical knowledge, information and directions for the proper construction of the said building, and to acquaint, specify, itemize, and describe in detail the necessary and proper sizes and dimensions for the beams, panels, and columns to be used in the construction and erection of said building, so that, when said building was being constructed and maintained, the said beams, panels, and columns would hold and maintain the load and weight designed to be placed upon said beams and panels of said building in reasonable safety and security.

"It was the duty of the said defendant the Gabriel Reinforcement Company to furnish plans which would specify and direct the use of reasonably safe, secure, and proper steel bars and rods to be used in the anchorage used in the construction of said building."

In 5 Corpus Juris, p. 269, the rule is stated as follows: ·

"In the preparation of plans and specifications, the architect must possess and exercise the care and skill of those ordinarily skilled in the business; if he does so, he is not liable for faults in construction resulting from defects in plans, as his undertaking does not imply or guarantee a perfect plan or a satisfactory result, it being considered enough that the architect himself is not the cause of any failure, and there is no implied promise that miscalculations may not occur."

This court has held that the responsibility of an architect does not differ from that of a lawyer or

physician. When he possesses the requisite skill and knowledge, and in the exercise thereof has used his best judgment, he has done all the law requires. The architect is not a warrantor of his plans and specifications. The result may show a mistake or defect, although he may have exercised the reasonable skill required. *Chapel* v. *Clark,* 117 Mich. 638 (76 N. W. 62, 72 Am. St. Rep. 587).

We think there was error in the charge of the court as above indicated, and it seems very clear to us that upon the condition of this record the defendant Gabriel Reinforcement Company was entitled to a directed verdict in its favor.

We are of opinion, however, that the questions of assumption of risk and contributory negligence of the plaintiff's decedent were questions for the jury, under proper instructions. He could not properly be charged with knowledge of the existing conditions.

What we have said of bad concrete and omission and misplacement of steel (for all of which defendant Everham was directly responsible) is as applicable to defendant Cowhey as to the other appellant, and it is unnecessary to repeat the statements. We have no doubt that, under our own holdings, the defendant Everham was an independent contractor. The rule upon that subject is well stated in *Bissell* v. *Ford,* 176 Mich. at page 73 (141 N. W. 860), and in other recent cases, among which may be mentioned *Wright* v. *Manufacturing Co.,* 124 Mich. 91 (182 N. W. 829, 50 L. R. A. 495); *Lenderink* v. *Village of Rockford,* 135 Mich. 531 (98 N. W. 4); *Burns* v. *Paint Co.,* 152 Mich. 613, (116 N. W. 182, 16 L. R. A. [N. S.] 816); *Kilts* v. *Board of Sup'rs of Kent Co.,* 162 Mich. 646 (127 N. W. 821).

We think the charge of the court with reference to the duty of defendant Cowhey was inconsistent. The jury was correctly instructed that the Gabriel Com-

pany was an independent contractor as to defendant Cowhey, but we think that was inconsistent with the charge in which the court instructed the jury, "I charge you that it was the duty of the defendant Thomas F. Cowhey to furnish \* \* \* proper plans and specifications"; and we think the latter charge was wrong as matter of law, and the question should not have been submitted, and, being inconsistent with the other part of the charge falls within the rule which we have frequently recognized, that the court will assume that the erroneous part of the charge was followed by the jury.

The thirty-first assignment of error of defendant Cowhey is well taken. It is to the effect that the court erred in charging the jury as follows:

"I charge you that if you believe from the evidence in this case that said defendant, said Cowhey, let the contract for the building of the garage to different contractors, and that during the progress Cowhey reserved to himself certain control of the manner of executing the work, and assumed control of the work, or some part of it, and that by reason of said control and interference on his part the said injury ensued, whereby said plaintiff's intestate was killed, while exercising due care on his part, then you should find said Cowhey guilty and plaintiff is entitled to a verdict against him."

We think we speak understandingly when we say that there is no evidence to warrant submitting the question to the jury whether defendant Cowhey gave orders and assumed and exercised control over the method of doing the work. The only testimony looking in that direction was that of defendant Everham, who testified to a conversation which he claimed to have heard between defendant Cowhey and Deppert upon November 4, 1912, when he found them together on the second floor. One cannot read this record without being satisfied that defendant Everham was very unfriendly to the defendant Cowhey, but undoubtedly

the question of the weight of his testimony would be for the jury; but, as we have said, the only testimony which he gave tending to connect defendant Cowhey with Deppert was as to the claimed conversation of November 4, 1912, which related to a different part of the building, to wit, the front of the building, which never fell, and it had no connection with that part of the building which did fall. We think the court should not have submitted to the jury the question whether defendant Cowhey placed Deppert in charge of the work. We find no evidence to support the claim or to warrant the submitting of that question; and there was positive evidence to the contrary. That such portion of the charge was prejudicial to the rights of defendant Cowhey cannot be doubted in the light of this record.

Upon the whole record we are of the opinion that the judgment as to both appellants was a miscarriage of justice.

For the errors pointed out, the judgment of the court below as to both of the appealing defendants is reversed, with costs, and a new trial ordered.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.