350 So.2d 1022 (1977)
R. L. REID, INC.
v.
Mildred PLANT, etc., et al.
SC 2187.
Supreme Court of Alabama.
September 30, 1977.
Rehearing Denied November 4, 1977.
William H. Hardie, Jr., of Johnstone, Adams, May, Howard & Hill, Mobile, for appellant.
Richard Bounds and John T. Crowder, J., of Cunningham, Bounds, Byrd, Yance & Crowder, Mobile, for appellees.
Bibb Allen, Birmingham, for Alabama Society for Professional Engineers, National Society for Professional Engineers, American Consulting Engineers Council, Consulting Engineers Council of Texas, Consulting Engineers Council of Alabama, amici curiae.
SHORES, Justice.
The plaintiff, a widow who sued under Title 26, § 312, Alabama Code, obtained a jury award in the amount of $350,000.00. The defendant appeals from a judgment for the plaintiff based upon that award. We reverse and remand.
*1023 This is our second review of this case. The first appeal dealt with the constitutionality of Title 7, § 23(1), Alabama Code, as it applied to this cause of action, and we held that as applied to causes of action in tort the terms of Act 788 creating that section were void for vagueness and uncertainty. The applicable statute of limitation was held to be Title 7, § 123, Alabama Code. Plant v. R. L. Reid, Inc., 294 Ala. 155, 313 So.2d 518 (1975).
The case was tried on the plaintiff's amended complaint alleging that the defendant company, engineering consultants, was employed by the Alabama State Docks Department ". . . to prepare specifications for alterations to the loading facility at the bulk-handling plant at the Alabama State Docks at Mobile, Alabama." The complaint continued:
"3. Plaintiff further alleges that the Defendants did prepare the specifications for the alterations hereinabove described and the alterations were subsequently made in accordance with such specifications.
"4. Plaintiff further alleges that in the exercise of reasonable care and diligence the specifications for the alterations of the conveying equipment at said loading facility as above set forth should have required that the conveyor be equipped with features to prevent slippage of the conveyor belt when operated under ordinary conditions and the specifications should have required built-in features to eliminate slippage of the conveyor belt when operated under extraordinary conditions.
"5. Plaintiff further avers that in the exercise of reasonable care and diligence the specifications for the alterations at the loading facility as above set forth should have designated that the control house for the west surge hopper at said bulk-handling plant be positioned so that the operator's vision of the conveying equipment and belt was not obscured.
"6. The Plaintiff further alleges that on November 25, 1972, her husband, Tramble Plant, while engaged in his duties as an employee of the Alabama State Docks was putting rosin in between the drive pully [sic] or drum and the conveyor belt in order to prevent slippage of the belt when his hands became caught between the drum or pully [sic] and the conveyor belt, pulling him into the conveyor proximately inflicting upon the Plaintiff's husband injuries which proximately cause[e]d his death.
"7. Plaintiff further alleges that the death of her husband, Tramble Plant, was the proximate result of the negligence of the Defendants in negligently failing to place a safety guard or shield over the moving portions of the conveyor system to protect the Plaintiff's husband and other employees who would be required to be in close proximity to said conveyor and who Defendants knew, or in the exercise of reasonable care should have known, would be in danger of having portions of their bodies or clothing caught in the conveyor."
After one mistrial, another trial resulted in a verdict for the plaintiff. The defendant's motions for a directed verdict, judgment N.O.V., and new trial were denied.
The defendant raises a number of issues on this appeal, not all of which need to be addressed. Among those raised are:
1. Whether recovery may be allowed against an engineer based upon negligent design of modifications when the machine to be modified was not substantially modified according to the engineer's design;
2. Whether recovery may be allowed against the engineer based upon negligent failure to provide a guard in the design of modifications to a machine when the engineer's contract was limited to specific modifications which did not include guards; and
3. Whether recovery may be allowed against an engineer for negligent design of modifications to a machine without testimony of a qualified expert that the engineer failed to use the skill exercised by others of his profession.
R. L. Reid, Inc. is a firm of consulting engineers whose headquarters are located *1024 in Houston, Texas. Its president, Robert L. Reid, is an experienced, professional construction engineer. On January 21, 1964, the firm entered into a contract with the Alabama State Docks Department whereby the Reid firm was to provide ". . . general engineering work and preparation of plans and specifications, and supervision of construction," including:
"(a) The furnishing of engineering services as requested by the Director, or his authorized representative, in the planning and construction of Bulk Ore Loading System, Scales, Railroads and appurtenances. Preparation of preliminary engineering studies[,] layouts, sketches, and reports, where applicable, and the Engineer's specific recommendations. Preparation of tentative cost estimates.
"(b) The planning of soil borings or subsurface investigations or any special surveys and tests required for design. Field surveys for design of structures, such as, buildings; not to include areas outside of structures. Furnishing engineering data, drawings, maps or plans necessary for permits required by local or federal authorities. Preparation of detailed design, drawings, specifications, detailed cost estimates and bidders proposal forms for authorized construction. Furnishing original and five (5) copies of plans and agreed number of specifications, notice to bidders and bidder's proposals. Assistance in securing, tabulating and analysis of bids and furnishing recommendations on the award of construction contract. Assistance in preparing formal contract documents.
"(c) Performing general supervision and administration of authorized construction (as distinguished from continuous resident field inspection), including periodic visits of the Engineer or competent representative of the Engineer to the site of construction; consultation and advice during construction. Check shop and working drawings furnished by the contractors; review laboratory, shop and mill tests of materials and equipment; preparation or review of monthly estimates of payments to contractors; supervision of initial operation of the project, or of performance tests required by specifications; make a final inspection of the project; revise the contract drawings to show the work as actually constructed."
Among the facilities operated by the State Docks are those which handle bulk ore. These consist primarily of ship unloaders and a conveying system which transfers the bulk material from the ship to a surge tank, which then empties the material onto a horizontal belt feeder which deposits it into railroad cars.
The facility at the State Docks, of which the belt feeder was a part, was designed originally by J. B. Converse in 1950. It was built by Rust Engineering in 1951. In 1964, the State Docks decided to increase the turn-around time of those ore ships unloading at the facility. The Reid firm was selected and it prepared and presented plans and specifications for the modification. The complaint in this case alleges that ". . . alterations were subsequently made in accordance with such specifications."
The original design for carrying the bulk material from the surge tank caused it to be deposited on the horizontal belt feeder which conveyed it to a spout through which it was loaded onto the cars. The horizontal belt feeder and the railroads cars were operated from a control room located on the same structure which contained the surge tank, the horizontal conveyor and the loading spout. The horizontal belt feeder was powered by a drum pulley, a powered cylindrical drum. The belt had a long-standing tendency to slip, and the customary procedure used by the attending workmen to alleviate slippage was to throw crushed rosin on the belt at the point where the belt joined the drum pulley. In doing this, a workman would stand on a catwalk adjacent to the pulley and throw rosin at the drive pulley where the belt and pulley came together, which was about five to seven feet from the catwalk. Apparently, one would stand as close as possible to that nip point in order to get as much rosin into it as he could.
*1025 Tramble Plant, the decedent, was normally employed by the State Docks as a crane operator, but like other employees, was working past his normal shift to assist in operating the bulk plant, probably because a ship had to be off-loaded. Plant was in the control room operating the horizontal belt feeder, but left that place to throw rosin on the belt. Although no one saw the accident, Plant was discovered a short time after he left the control room. His body had been forced through an opening approximately six inches wide between the drum pulley and a section of angle iron, his arm having been caught between the belt and the drum.
The evidence is uncontradicted, however, that the plans and specifications prepared by Reid were not followed by the State Docks. The theory of the plaintiff's case is that Reid was negligent in failing to provide for a guard to shield the nip point of the head pulley, the point at which Mr. Plant met his death. However, it is again uncontradicted that had the State Docks followed the plans and specifications as prepared by Reid, no guard would have been necessary at this point, because the belt feeder would not have been accessible to workmen. It is also uncontradicted that, at the time of Mr. Plant's death, the State Docks had long since converted the facility and no longer purported to employ the Reid modifications.
The plaintiff's position is that Reid owed a duty to third persons in the performance of its contract with the State Docks, and it breached that duty to plaintiff by failing to include a guard in the plans and specifications submitted to the State Docks. The plaintiff concedes that the contract did not call for any safety features. However, she relies on testimony from an engineer employed by the State Docks to the effect that safety is always a factor in drawing any plans and specifications. She did not come forward with any testimony that safety guards of the type she says should have been recommended by Reid were commonly recommended by engineers on such projects in 1964. Her only evidence on this crucial point consisted of testimony by an engineer who could testify to no more than his opinion that guards should have been included in this project in 1964. This witness, a 1969 graduate, was not a member of the profession at the time and never testified to the state of the art in the engineering field in 1964. At most, he simply expressed an opinion that guards should have been recommended, without saying that such was an established practice in 1964.
Experts may be permitted to state facts known to them because of their expert knowledge but should not be allowed to substitute opinion for fact, although they can express an opinion on established or assumed facts. Devore v. Schaffer, 245 Iowa 1017, 65 N.W.2d 553, 51 A.L.R.2d 1041 (1954).
She offered no other testimony that such was the state of the art at the time.
The questions put to this witness were as follows:
"Q Based on what you've told us of your study of the plans and specifications, the contract, your visit to the scene, your observing the operation of the conveyor system, and your study of the photographs  and I'll ask you to assume that on November 24th, 1972, at about 2:30 P.M., Tramble Plant left the  the belt began to slip; it was in operation; they were loading  well, unloading cast iron pellets; and the weather was wet and damp; and Tramble Plant and Ronnie Giles were in the control room; and the belt began to slip, and Tramble Plant said, `I'll get it this time.' And the procedure was that if this occurred to go out and take a handful of rosin and throw it between the drive pulley and the belt on the west end of the conveyor system, and that shortly thereafter witnesses underneath noticed fabric from clothing coming down through the hopper; that there has been further proof that they went immediately to the scene and found that Tramble Plant was caught  that his *1026 arm and hand were caught between the drive pulley and the belt; that he was upside down into the hopper and had been pulled through a space some six to eight inches or a foot wide between the drive pulley and the structural members running adjacent to it; that the machine was stopped and that he was in fact caught in there and had to be cut out. Now, based on those facts and based on your examination of the other matters in this case, do you have an opinion as to whether the defendant, R. L. Reid, with respect to his preparation of those plans and specifications complied with or conformed with the standard of care governing the conduct of that company and other professional engineering consulting firms in Alabama with equal education and experience and acting under the same or similar conditions?[1]
". . .
"A Yes. My opinion is that there should have been some guarding device to prevent human beings from being pulled into the in-running nip there. Now, there are a number of solutions, but I was going to keep it simple by saying the major objection I have is that there should have been some guarding device there.
". . .
"Q Now let me ask you this; is the opinion that you've given with regard to compliance by Reid and Company to the standard of care, is your opinion altered in any way by the fact that R. L. Reid, Inc. did not design or install or have anything to do with the original facility in 1950, but rather was employed only to draw the plans and specifications for the alterations made in 1964?
". . .
"A Yes. If engineers are going to be professionals in the same sense that the profession wants and that the professional engineering societies to which I belong and possibly to which Mr. Reid belongs want, if we are going to raise or if we have raised engineering to the professional status as that of attorneys and physicians, then I think that certainly we have to follow the code of ethics and interpret that always in favor of the public and people who are around things that we design and build. And there is no question that when the machine was first designed it was designed badly and it was unsafe to begin with; and I feel that when Mr. Reid and his associates came to the point of re-design that the problem did exist and they should have recognized that there was a dangerous situation there and in the course of their re-design of it, it should have been brought up to the contemporary standards at that time; and I do not feel that the fact that Mr. Reid was engaged by the State Docks to do exactly as they told him and nothing else  I do not feel that that is a good defense professionally because in other professions similar arguments do not hold much water . . . ." (Emphasis Supplied)
In addition to this, the plaintiff put various pamphlets into evidence which illustrated that guards should be placed at points on conveyor belts where humans were likely to come into contact. However, had the plans and specifications recommended by Reid been adopted by the State Docks, the nip point of the head pulley would not have been accessible to humans and, therefore, a guard would not have been required to meet the standards of the profession as they existed in 1964. An engineer may not be held liable for injuries which could not have occurred had his modifications been *1027 adopted. Bayne v. Everham, 197 Mich. 181, 163 N.W. 1002 (1917). Two experts testified to the effect of Reid's recommendations, and this was not contradicted by the plaintiff, other than by the testimony set out above, in which her expert expressed the opinion that Reid should have brought the facility, which was unsafe to begin with, up to contemporary standards. Before Reid could be found negligent in the performance of his duty, it must be shown that he failed to meet the standards of his profession existing at the time he performed the services. In Looker v. Gulf Coast Fair, 203 Ala. 42, 45, 81 So. 832, 835 (1919), this court stated the duty to be as follows:
". . . A competent architect, pursuing an independent profession, is not an insurer of the accuracy or perfection of his work. In preparing plans and specifications he must be faithful and possess and apply the ordinary care and skill of the ordinarily skilled in that profession.. . ."
Significantly, the only evidence of the extent of the professional standards in 1964 came from the defendant's experts, which established without contradiction that guards were not a recommended procedure under these facts in 1964.
We might agree with the plaintiff that guards should have been specified had Reid not recommended moving the belt feeder so as to make it inaccessible to humans which, according to the evidence, would have met the professional standards existing in 1964.
The plaintiff apparently concedes that Reid would not be liable had its plans and specifications contained a recommendation that the nip point be guarded and the State Docks had failed to follow that recommendation. We can see no difference where it is conceded that Reid recommended that the belt feeder be moved some 1' 8" so as to make it inaccessible to workmen, and this recommendation was not followed by the State Docks.
The plaintiff's own witness stated that there were a number of possible solutions to the safety problem, of which the Reid recommendation may well have been a satisfactory one. This witness stated only that it was his personal preference to install guards.
There is no doubt, having read the record, that the practice of throwing rosin into the moving belt at the nip point was dangerous and by condoning it, or directing it, the State Docks was negligent, or even wanton, demonstrating as it does, a total disregard for the sanctity of human life. But to charge Reid with responsibility for alleviating this practice which he testified he knew nothing about (and there was no evidence that he did), simply because he agreed to make some modifications in the facility years after it had been installed, is not sanctioned in the law. There is nothing in his contract to suggest that he assumed any responsibility for correcting all defects in the design of a facility some fifteen years old at the time he undertook to modify it to make it more efficient. There is no evidence that his plans and specifications made the facility more dangerous. He is charged with the sin of omission. According to the plaintiff, he should have recognized the danger and should have made a specific recommendation to eliminate that danger. The fact that the recommendation which he did make would have alleviated the danger, had it been followed, is said by the plaintiff not to excuse him for failing to specify another procedure which would have also eliminated the danger, assuming it had been adopted by the State Docks. This cannot be the law.
The plaintiff has failed to establish by the evidence that Reid breached any duty to the decedent by failing to specify the installation of a guard at the point where Mr. Plant met his death. The plaintiff has this burden under our practice and, having failed to establish this element of her claim, the defendant was entitled to a new trial.
The cause is, therefore, reversed and remanded for a new trial.
REVERSED AND REMANDED.
TORBERT, C. J., and BLOODWORTH, MADDOX and JONES, JJ., concur.
*1028 FAULKNER, EMBRY and BEATTY, JJ., dissent.
ALMON, J., recused himself.
BEATTY, Justice (dissenting).
I dissent.
(1) Defendant's first position is that plaintiff could not recover because the conveyor system for which defendant was employed to design modifications was not in fact substantially modified according to his design. In other words, defendant maintains that his recommendations were not followed, so he cannot be held liable for an injury caused by a design of someone else. That argument is untenable in this instance because it assumes that the defendant did design some modifications for that aspect of the feeder operation which was the source of the accident.
It is without dispute that the defendant's designs under his contract did include specifications which called for changes in the belt feeder. These were manifested in defendant's exhibit 3, admitted into evidence. They called for increasing the capacity of the belt conveyor to 2500 TPH by replacing the existing gear-reducer; replacing the existing roller chain drive, and relocating and revising the existing drive pulley and supports; revising the receiver and car loading spout; re-working the existing skirtboards to provide clearance around the feeders under the surge bin; removing the belt scale not required for operating the belt conveyor; and relocating the existing return rolls and removing the shims from under the troughing idlers. However, these modifications did not include either a design or specifications for a guard at the nip point. As already noted, there was evidence that the purpose of the contract with the defendant was to speed up the conveyor system, which was accomplished. Those changes were made, but later the system broke down and the original drive was re-installed on the pulley. Certainly under the allegations of plaintiff's complaint which alleged that Plant's death
. . . was the proximate result of the negligence of the Defendants in negligently failing to place a safety guard or shield over the moving portions of the conveyor system . . . (Emphasis supplied)
the plaintiff could prove the failure to specify such safety features in the specifications which were actually prepared. In short, the plaintiff's theory was that there was an absence of a safety design for a hazard known or which should have been appreciated, rather than a design made but not followed. (Mr. Reid himself testified: "Q. I mean it is a significant hazard  if a man gets caught in that, he's gone, isn't he? A. Right.") Accordingly, the cases of Day v. National U. S. Radiator Corp., 241 La. 288, 128 So.2d 660 (1961) and Bayne v. Everham, 197 Mich. 181, 163 N.W. 1002 (1917), cited by the defendant, are inapposite because they deal with factual situations in which specifications regarding safety features were actually made but not followed. In this instance none were specified, and under the plaintiff's contention this failure to specify is the gist of her cause of action. This factual issue was addressed in Beloit v. Harrell, 339 So.2d 992 (Ala.1976). In that case a manufacturer of a paper-making machine was found not to have designed it to prevent a subsequent injury to a workman. The plaintiff's theory was that in designing the machine the manufacturer failed to design safeguards at the nip point between the rolls in a calendar, and we held that liability might ensue even though the operator of the machine had modified a part of it, because the modification was found not to have had any safety function. Quite obviously, if the contrary had been true and the designed parts removed by another, the defendant's theory would have applied and no liability would have resulted. Bayne v. Everham, supra; Hoehn v. Minnesota Mining & Mfg. Co., 248 Minn. 162, 79 N.W.2d 19 (1956).
(2) The defendant's next contention is that his contract did not include guards for the nip point, but was limited to specific modifications. The question this proposition raises is, of course, what was the scope of the contract?
*1029 We agree with the defendant that the contract was one calling for modifications in an already existing structure and, ipso facto, his plans were to be limited. But of what were those limited plans to consist? The chief engineer of the Docks testified to their reliance upon the defendant to develop a safe plan. Had the specifications included a guard over the nip point, he knew of no reason why it would not have been installed. He acknowledged that safety "is a necessary consideration of any work done in the way of drawing plans and specifications for an industrial facility." Even the defendant's expert engineer, Dr. Brooks, testifying to the scope of the contract, conceded that the contract did not prevent the defendant from incorporating safety features into the design of the equipment. Mr. Reid himself testified to other safety recommendations he made:
A. The operation of the equipment was not correct?
Q. Why do you say that?
A. Because they on this  for safety reasons I recommended that we keep the  keep pressure in the house . .

. . . . .
Q. Is what you are saying that the State Docks insofar as the operation of the equipment is concerned did not follow your safety recommendations?
A. That's right.
Q. Was any consideration given to safety cables along the belt itself to enable workmen to stop it from those positions other than from the control house?
A. I mentioned it to them but they had some problems there. They didn't want me to do it. They didn't want me to put it in.
Q. Did you recommend it?
A. Well, I don't know what you mean by recommend; we suggested it. We don't  it wasn't the policy  this was an emergency job  to put everything in writing. In fact, there wasn't hardly anything put in writing.

Following this exchange, Mr. Reid also testified:
Q. Do you admit to the jury that it was your responsibility or the responsibility of your company and the engineers who drew these plans and specifications to consider the aspect of safety when they were doing so?

A. Yes. Would you like for me to elaborate on it?
Q. It doesn't matter 
A. I'm going to tell you  you asked the question and I'm going to tell you what we did. In the first place I wanted to eliminate the railroad switchback to eliminate the danger of somebody getting hurt down there. The second thing I did, we air-conditioned the control room so they would have a better place to work and to keep the dust out of the equipment to prevent fires. We put an air jet on the windows to keep them clean so they could see better out of the windows of the new control room. We also show an air jet on the west side, which was never installed, and that is the side that you could have seen this belt 
Q. All right 
A. No, I'm not through  you asked me the question. I recommended to them from the very beginning that they have some cable stope on there for emergency stops, and they said, `We'll take care of that.' Now they have an engineering department and they have a registered engineer; I had no reason to believe that they themselves would not take care of anything else that needed to be done on that. We had a limited contract; they needed it done in a hurry. The other things their engineering department said they would do.
Q. Did you recommend a guard?
A. No, we didn't recommend a guard because a guard wasn't necessary.
Q. It wasn't necessary on that other end?
*1030 A. No  that was not my contract.
Mr. Reid later testified that "if they had followed my drawing, there wouldn't have been any need for a man to be up there." Even so, the testimony of all of these witnesses, and Reid in particular, was sufficient to make a jury question of the scope of the contract, that is, whether it included the defendant's obligation to make safety recommendations in his designs pertaining to the drum pulley. McGehee v. Frost, 268 Ala. 23, 104 So.2d 905 (1958).
(3) Reid's testimony, standing alone, might have foreclosed any issue on his duty to make safety designs pertaining to the operation of the drum pulley, but the plaintiff's evidence furnishes a "mere gleam, glimmer, spark, the smallest trace, or a scintilla" in support of the theory of his duty in that connection, so it was a question for the jury. Pettway v. Pepsi-Cola Bottling Co., Inc., 337 So.2d 757 (Ala.1976).
Some, although not all, of that testimony came from the plaintiff's expert, Dr. Richard Macon.
Numerous Alabama cases recite our rule that the determination of whether a witness is qualified to testify as an expert is primarily within the discretion of the trial judge, and his ruling on that issue will be disturbed on appeal only when it is patently abusive. Ford Motor Co. v. Rodgers, 337 So.2d 736 (Ala.1976); Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974); Lehigh Portland Cement Co. v. Dobbins, 282 Ala. 513, 213 So.2d 246 (1968). In this instance Dr. Macon testified to his opinion that safety was an important aspect of engineering design in 1964, and that there should have been a guarding device on the in-running nip to prevent persons from being pulled into it. He maintained that the "state of the art" at that time had advanced to where there were feasible guards which would have eliminated this hazard. He also stated that:
. . . [w]hen Mr. Reid and his associates came to the point of re-design that the problem did exist and they should have recognized that there was a dangerous situation there and in the course of their re-design of it, it should have been brought up to the contemporary standards at that time; . . . and in this case I believe some thought should have been given to the people that are running around this device and have to work near it.
These opinions were allowed from a witness who was graduated in 1969 from the University of South Alabama with a degree in electrical engineering, and received a masters degree in mechanical engineering from Southern Methodist University in 1973. He combined this academic training with one and one-half year's employment as a designer and conductor of static and fatigue tests on aircraft components with General Dynamics Corporation, then was a research and development engineer with Southwest Wheel and Manufacturing Company, designing and testing automotive-related components. Thereafter he lectured in electrical engineering and taught courses at the University of South Alabama in engineering mechanics and machine design. He testified to his familiarity, through studies and experience, with the art of machine design predating 1964, after all of which the trial court allowed him to state the opinions we have indicated. Under this evidence we should not state that the trial court patently abused his discretion by allowing the witness to state his opinions.
Accordingly, the trial court was correct in allowing the expert opinion evidence, and the result should be to affirm the verdict for the plaintiff. But the majority questions the power of this expert to testify to the "state of the art" which existed before he became an engineer. Make no mistake about it, this holding of the majority places a severe restriction upon expert testimony and represents an unfortunate step backward in the development of the law of evidence.
FAULKNER and EMBRY, JJ., concur.
NOTES
[1] Assuming, without deciding, that the proper standard is stated in this question, the answer is unresponsive. Therefore, we need not decide whether the standard to be applied to the profession is limited to the conduct of the profession in the State of Alabama.