HENRY HOEHN v. MINNESOTA MINING &
MANUFACTURING COMPANY.
DAYTON'S BLUFF SHEET METAL WORKS
AND OTHERS, RESPONDENTS.

79 N. W. (2d) 19.

October 26, 1956—Nos. 36,914, 36,915, 36,916.

*R. E. Cummins, Linus J. Hammond,* and *Cummins, Cummins, Hammond & Ames,* for appellant.

*Doherty, Rumble & Butler, R. J. Leonard,* and *Eugene M. Warlich,* for respondent Ellerbe & Company.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and *David W. Nord,* for respondent Curtis 1000, Inc.

*Gordon Mangan, Bundlie, Kelley & Maun,* and *O. C. Adamson II,* for respondent Dayton's Bluff Sheet Metal Works.

*Lipschultz, Altman & Geraghty,* for respondent Henry Hoehn.

KNUTSON, JUSTICE.

Originally this action was commenced against Minnesota Mining & Manufacturing Company, a corporation; Dayton's Bluff Sheet Metal Works; Curtis 1000, Inc., a corporation; and Ellerbe & Company, Inc., a corporation, to recover damages for injuries sustained by plaintiff when a row of 15 steel lockers, bolted together and installed in a new building constructed by Minnesota Mining & Manufacturing Company, fell on him while he was engaged in cleaning the interior of the lockers. At the close of plaintiff's case, the action

was dismissed by the trial court as to Dayton's Bluff Sheet Metal Works. At the close of all the testimony, the court granted a motion by Curtis 1000, Inc., for a directed verdict, considering it in the nature of a dismissal on the merits, and the case thereafter was submitted to the jury as against Minnesota Mining & Manufacturing Company and Ellerbe & Company, Inc. The jury returned a very substantial verdict against Minnesota Mining & Manufacturing Company and exonerated Ellerbe & Company, Inc., of any liability.

Thereafter, Minnesota Mining & Manufacturing Company moved for judgment notwithstanding the verdict or a new trial and further that the verdict in favor of Ellerbe & Company, Inc., be set aside and that the dismissal of the action in favor of Dayton's Bluff Sheet Metal Works and Curtis 1000, Inc., likewise be set aside. All of these motions were denied by the trial court. An appeal thereafter was perfected by Minnesota Mining & Manufacturing Company to this court from the order of denial. Pending a hearing of this appeal, Minnesota Mining & Manufacturing Company effected a compromise settlement with plaintiff. On motion of Dayton's Bluff Sheet Metal Works, Curtis 1000, Inc., and Ellerbe & Company, Inc., the appeal was then dismissed without prejudice to the rights of Minnesota Mining & Manufacturing Company to appeal from judgments which might be entered in favor of the moving defendants. Judgments thereafter were entered in favor of Dayton's Bluff Sheet Metal Works, Curtis 1000, Inc., and Ellerbe & Company, Inc., and appeals were taken to this court from such judgments by Minnesota Mining & Manufacturing Company.

Questions raised by the original appeal involving an alleged bar of the Workmen's Compensation Act; negligence of defendant Minnesota Mining & Manufacturing Company and the contributory negligence of plaintiff; and alleged errors affecting the liability of and the right of recovery against Minnesota Mining & Manufacturing Company have now become moot by virtue of the settlement made by that defendant with plaintiff. All that remains for determination is whether the evidence sustains the jury's verdict in favor of Ellerbe & Company, Inc., and whether the court's dismissal of the

case against Dayton's Bluff Sheet Metal·Works and the granting of the motion for a directed verdict in favor of Curtis 1000, Inc., which was treated by the court as a dismissal on the merits, are sustained by the record. The facts will be stated only insofar as it is necessary to dispose of these issues.

Minnesota Mining & Manufacturing Company, commonly called and referred to hereinafter as 3M, is a manufacturing concern with its principal office and place of business in the city of St. Paul, Minnesota. It manufactures hundreds of products, including sandpaper, undercoating, paint, and a variety of other products. In 1949, 3M determined to construct a new five-story office building in St. Paul. It has on its payroll, among other employees, a large number of architects and engineers. 3M's architects and engineers prepared the original and preliminary designs and general layout sketches of the building and then engaged Ellerbe & Company, Inc., a large and well-established architectural firm in St. Paul, under a written contract, to prepare the detailed plans and specifications. The building was to be constructed by 3M without the use of a building contractor. Because of that fact and because 3M had a staff of its own architects and engineers, the usual close and detailed supervision of the building by the architect was not required by the contract. Conferences were held between the engineering and architectural departments of 3M and members of the Ellerbe firm from time to time, and such supervision as was requested was all that was required.

Among the items to be designed were lockers for use in the building. Ellerbe's staff was informed that 3M wanted lockers that were movable so that they could be rearranged from time to time as need for changes arose; the lockers were not to be anchored or fastened to the walls or floor. With this requirement in mind, Ellerbe drafted specifications for lockers, the material portion of which reads as follows:

"Section 16—Metal Specialties

"16-01. General

"The work in this section consists of furnishing all labor, material and appliances in connection with the fabrication and installation,

complete, of the following items. Submit shop drawings for all items.
"1—Lockers.

*    *    *    *    *

"16-02.   Metal Lockers.

"All lockers shall be of sizes shown, single tier, standard type with all necessary trim mouldings. Lockers shall have grooved key, two per locker and shall be master keyed.

"Lockers shall be welded steel sheet construction, *not less than 16 gauge for doors and frames and exteriors; 24 gauge for interior divisions.*

*    *    *    *    *

"All bases shall be stainless steel over steel frames, satin polished finish.

"Installation

"Installation of lockers shall be made by mechanics skilled in that line of work. Lockers side by side may have common divisions and shall be rigidly secured to each adjoining unit. Lockers shall be installed in batteries of several units and shall be so erected that any battery of lockers may be removed or replaced. Provide all necessary fillers & bases at wall or corners as called for, furnished to match lockers." (Italics supplied.)

It was later found that stainless steel bases could not be obtained, so the specifications were altered to read:

"Stainless steel base for metal lockers as specified in Section 16-02 shall be omitted.

"Lockers shall be furnished without legs or with standard metal base. Set lockers on 6" high wood base cut from 2" dimension lumber placed 3" back from face of lockers to provide toe space. The 6" rubber base as specified in all locker rooms shall also run in front of or around all lockers."

In the interval between the drafting of the original specifications and this amendment, 3M, through its purchasing department, received bids for lockers from Curtis 1000, Inc., and others engaged in the sale of such equipment. After some discussion between a sales-

man for Curtis 1000, Inc., and a member of the purchasing department of 3M, a letter was submitted to 3M bearing date July 26, 1950, reading as follows:

"We are pleased to quote on your locker requirements, totalling 1282 lockers. We propose to furnish Berger Lockers No. 2217 Type SS, 12x21x72 in standard gray finish.

"1282 No. 2217 Type SS Lockers 12x21x72

(F.O.B. Canton) ............................... $ 8.03

"Yale or National Groved Key Locks No. R-481 ½
dead bolt, master keyed and two keys for each
lock. Keys to be numbered in accordance with
number plates on lockers ......................... .93 ea.

"For closed metal base add ...................... .36 "

"For sloping tops add ........................... .53 "

"Railroad freight St. Paul Car .................... .77 "

"Truck Rate delivered on dock .................... .90 "

"Lockers Weight 62# each.

"Rail rate $1.21 per hundredweight plus 3% tax.

"Truck " 1.44 " " " 3% tax.

"Price quoted is K.D.

"This is a firm price for shipment before December 31, 1950. Delivery 60 to 75 days after receipt of order."

This bid was orally accepted by 3M, the order later being enlarged to include 1,578 lockers instead of 1,282. On August 7, 1950, Curtis 1000, Inc., wrote 3M as follows:

"As per your telephone conversation with our representative, Mr. John Bordenave, we are pleased to increase your locker order on Requisition #9748 to 1,578 Type SS Lockers, 12 x 21 x 72". Lockers are to be furnished in a baked on enamel, standard grey finish, equipped with coat rods and hangers, and to be numbered consecutively 1 thru 1,578.

"Each locker is to be equipped with a National Grooved Lock with two (2) keys per lock and master keyed.

"Lockers are to be set up on an island base installed by your carpenter. We propose to install these lockers at a base rate of $2.06 per locker or the prevailing union scale at time of erection.

"1,578 Type SS Lockers at $9.86, lockers to be delivered knocked down, F.O.B. your dock. This is a firm price for shipment before December 31, 1950. If there are any further questions arising from this change of order, please do not hesitate to call on us."

Bearing the same date, 3M issued a so-called purchase order, which is really a confirmation of the deal previously consummated, containing the following paragraph which gives rise to much of the argument involved in this appeal.

"Confirmation

**1578**

"~~1278~~ each Grey metal lockers 12″ x 21″ x 72″, single tier, standard type with all necessary trim mouldings. Lockers shall have grooved key, two per locker and shall be master keyed. Lockers shall be welded steel sheet construction, not less than 16 gauge for doors and frames and exteriors; 24 gauge for interior divisions."

At the time the original bid was received, 3M's purchasing department, as well as its own architects and engineers, had one of Berger's catalogs available. Reference to this catalog would have disclosed immediately that the type of locker covered by the bid was constructed of 24-gauge steel on the entire exterior except the front, which was 16-gauge steel. The lockers were delivered in crates unassembled. In the meantime, Curtis 1000, Inc., had contracted with Dayton's Bluff Sheet Metal Works to assemble and erect the lockers on the bases built by 3M according to the blueprints and the directions of the manufacturer which came with the locker parts. After the lockers were assembled, plaintiff, with another employee, was assigned the job of cleaning the interior of the lockers, and, while he was so engaged, a bank of 15 lockers, weighing 818 pounds, tipped over on him, causing very serious injuries.

ELLERBE & COMPANY, INC.

It is the contention of 3M that Ellerbe & Company, Inc., is liable because it failed to design lockers which were safe for use under the circumstances described to it. Ellerbe & Company, Inc., on the other hand, contends that it did design safe lockers but that 3M, without its knowledge or consent, deviated from the type of locker it designed and specified and, on its own responsibility, purchased a different type of locker.

The record shows that 16-gauge steel is approximately two and one-half times as heavy as 24-gauge steel. A bank of 15 lockers, all of which were bolted together, designed as specified by Ellerbe & Company, Inc., would weigh 1,077 pounds, whereas the lockers purchased weighed 818 pounds. Most of this additional weight would be on the back of the lockers so that the center of gravity would be farther back than it was on the lockers purchased, which would make the lockers much less likely to tip forward. There is evidence that the lockers, even as designed, would not have the desired margin of safety, but there is also much evidence to the contrary. In addition to a deviation from the specifications as to the type of steel to be used, shop drawings were not furnished as the architect provided. Shop drawings are detailed plans prepared and furnished by the manufacturer, and these drawings would have disclosed the type of steel used throughout these lockers. Ellerbe contends that failure to furnish such shop drawings prevented it from ascertaining that there had been a departure from its specifications.

It seems clear to us that the jury's verdict is amply sustained by the evidence. The jury could find that Ellerbe & Company, Inc., designed and specified a locker safe for the use for which it was intended; that Ellerbe was under no duty to inspect the installation of the lockers unless requested to do so and that no such request was made; that independently 3M purchased lockers of a different type than those specified; and that the lockers purchased were not safe for use in the manner intended. The jury could further find that 3M was required to furnish shop drawings of the equipment pur-

chased, which it failed to do, and that Ellerbe thereby was deprived of the opportunity of discovering the departure from the specifications. Under these circumstances, it must follow that Ellerbe & Company, Inc., is not liable. Where an architect is retained to design a piece of equipment suitable and safe for use under circumstances described to him and he does design equipment safe for use under those circumstances, he cannot be held liable where the one for whom the equipment is designed takes it upon himself to depart from the specifications and installs other equipment not safe for such use, in the absence of a duty on the part of the architect to inspect the installation of the equipment.

### DAYTON'S BLUFF SHEET METAL WORKS

It is somewhat difficult to determine on what theory 3M seeks to charge Dayton's Bluff Sheet Metal Works with negligence. Apparently it is on the theory that, after the workers had assembled the lockers, employees of this defendant knew or should have known that the lockers were shaky and unsafe and should have taken some steps to stabilize them. This defendant was given the job of assembling the lockers as shipped and placing them upon the platforms constructed by 3M. There is no claim by anyone, even to this date, to say nothing about a complete absence of evidence, that Dayton's Bluff Sheet Metal Works did not assemble and install the lockers exactly according to the directions of the manufacturer and the blueprints of 3M. Thereafter, the installation was inspected by a civil-engineer employee of 3M and accepted. Dayton's Bluff Sheet Metal Works was under no duty to inspect. Neither the directions of the manufacturer nor the blueprints and specifications of 3M or its architects required the lockers to be anchored or fastened to the wall or floor. This defendant was not only not required to anchor the lockers but had no authority to do so. We fail to see how the evidence establishes any negligence attributable to Dayton's Bluff Sheet Metal Works. Consequently, it was proper for the court to dismiss the action against it.

## Curtis 1000, Inc.

■ Liability against Curtis 1000, Inc., must be predicated, if it exists at all, on a negligent failure to furnish the lockers 3M purchased. In order to establish this proposition, 3M proceeds on the theory that this purchase was based on the confirmation sheet dated August 7, 1950, the essential part of which is set forth above. The evidence establishes, however, that the bid of Curtis 1000, Inc., was accepted and the purchase completed prior to the preparation of this instrument, which, instead of constituting the contract of the parties, was supposed to be a confirmation of a contract already consummated. With respect to the terms of the contract, the evidence shows that, at the time 3M's purchasing department received the bid of Curtis 1000, Inc., it had available to it a catalog of Berger's, the manufacturer of these lockers, showing the exact description and specifications of the type of locker covered by the bid. It also had the architect's specifications. No one representing Curtis 1000, Inc., ever saw the architect's specifications. They did see the blueprints, but the blueprints contained no detailed description of the lockers required.

It also appears that many, if not all, of the manufacturers of this type of locker have standardized the construction of it and that a standard locker is made of 16-gauge steel on the front and 24-gauge steel on the balance of the exterior, exactly like the ones furnished here. 3M received at least one other bid. That bid also was based on the same gauge steel as the bid of Curtis 1000, Inc. 3M had purchased many lockers before this, all of which were of the same type of construction as those purchased here. There is some evidence that, when Curtis 1000, Inc., received the confirmation sheet referred to above, its representative called the purchasing department of 3M and was advised to disregard the discrepancy between the bid and the confirmation as to the gauge of steel involved. Even if that testimony be disregarded, it seems inconceivable that 3M did not get exactly what it ordered and purchased.

There is some claim that the members of the purchasing department who placed the order had no authority to deviate from the specifications of the architect. The seller could hardly be chargeable with knowledge of the intricate corporate rules of authority or lack of it of the many interlocking departments of a concern as large as 3M. It dealt with the man who represented the purchasing department of this company, which was held out to the public as the department which had authority to make purchases, as it had done before. Pursuant to that dealing, it submitted a bid to furnish a specified article for a specified price. The company accepted that bid and received and accepted the article covered by the bid. 3M had ample opportunity to check the description of the article covered by the bid in the manufacturer's catalog and to compare it with the architect's specifications. If it chose to purchase without ascertaining whether the equipment it purchased complied with the architect's specifications, it should not now be heard to say that the seller was negligent in not supplying something it did not offer to sell in its bid. We think that the evidence is conclusive that 3M received exactly what it purchased; consequently, that the court correctly held that Curtis 1000, Inc., was not liable.

Affirmed.