JAMES H. LAKE, Respondent, *v.* JOHN B. McELFATRICK et al., Appellants.

| 139 | 349 |
| 166 | 314 |

In an action against an architect to recover damages alleged to have resulted from a defect in plans and specifications furnished by him for the erection of a building, it is incumbent upon plaintiff to prove a substantial compliance with the plans and specifications, and when a variance appears involving the integrity of the mode of construction of the affected part, and so far material that it may have been the direct cause of the injury complained of, the architect is not liable, and a submission to the jury of the question as to whether or not the variance did or did not cause the injury, is error.

(Submitted June 23, 1893; decided October 3, 1893.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made June 23, 1892, which affirmed a judgment in favor of plaintiff entered upon a verdict and affirmed an order denying a motion for a new trial.

This action was brought by plaintiff as assignee of C. F. Lake, to recover damages sustained by reason of defective plans, specifications, drawings and statements made by defendants, a firm of architects.

The allegations of the complaint and the facts, so far as material, are set forth in the opinion.

*George W. Cothran* and *Van Dusen & Martin* for appellants. Recovery can be had only for cause of action alleged.

*Wright* v. *Delafield*, 25 N. Y. 266, 270; *Day* v. *Town of New Lots*, 108 id. 148, 154; *Baird* v. *Mayor, etc.*, 96 id. 603; *Truesdell* v. *Sarles*, 104 id. 167; *Hudson* v. *Swan*, 83 id. 552; *Southwick* v. *F. N. Bank*, 84 id. 428; *Neudecker* v. *Kohlberg*, 81 id. 301; *Romeyn* v. *Sickles*, 108 id. 650; Code Civ. Pro. § 541; Taylor on Ev. § 218; *Walter* v. *Bennett*, 16 N. Y. 250.) Defendants are not liable unless their plans, etc., were complied with. (*Oakley* v. *Morton*, 11 N. Y. 25; *Nelson* v. *Odiorne*, 45 id. 489; *Glaholm* v. *Hays*, 2 M. & G. 266; *Richie* v. *Atkinson*, 10 East, 295; *Boone* v. *Eyre*, 1 H. Bl. 273; *Bank of Montreal* v. *Recknagel*, 109 N. Y. 482.) Plaintiff cannot recover in this action when he proves affirmatively that he did not perform the conditions upon which alone defendant's liability rested. (*Allen* v. *G. A. Ins. Co.*, 123 N. Y. 6, 12, 13; *Clark* v. *Fey*, 121 id. 470; *Tobias* v. *Lissburger*, 105 id. 404; *Norrington* v. *Wright*, 115 U. S. 188; *Glaholm* v. *Hays*, 2 M. & G. 265; *Graham* v. *F. Ins. Co.*, 87 N. Y. 69; *Dwight* v. *G. L. Ins. Co.*, 103 id. 347.)

*C. D. Murray* for respondent. The court charged the jury, " The plaintiff claims that after he had directed them to build an archway that was so flat as that, that he ought to have instructed them to use a different kind of mortar, a mortar made of cement, but that in view of the kind of mortar they directed to be used, that this archway was not properly constructed." There is no objection to the charge. As the question was not raised on the trial, and not presented by an appropriate exception, it cannot be raised in the appellate court. (*Adams* v. *Bank*, 116 N. Y. 606, 614; *Wellington* v. *Morey*, 90 id. 656; *Stirrett* v. *Bank*, 122 id. 659.)

MAYNARD, J. The compass of our inquiry in this case is restricted within narrow bounds by the form of the pleadings and the admissions contained in them and made upon the trial.

The plaintiff alleges that his assignor, on April 1, 1887, was about to construct an opera house at Titusville, Pa., and desired the services of a competent architect for such purpose;

that the defendants were copartners doing business in New York city, and that they held themselves out to be, and represented and warranted themselves to be, competent, skilled architects, and particularly skilled in the art and science of making plans, specifications, drawings and detailed statements of all that was necessary in and about the construction of theaters and opera houses, so that if their plans, details and specifications were followed, the building would be constructed in a good, accurate and substantial manner; that plaintiff's assignor relied upon such representations and warranty, and employed the defendants to make the plans, drawings, specifications and detailed statements of all that was necessary to be done in and about the construction of a theater or opera house for him, and agreed to pay them for their services three hundred and fifty dollars; that in consideration thereof, the defendants agreed to make such plans, specifications, drawings and detailed statements, and that they should in all things be accurate, sufficient and correct, and that if they were followed in the construction of the building, the plaintiff's assignor should have a fine, well-constructed opera house or theater, complete in all its parts, and without injury or damage to him by reason of any defect in the plans, or any failure or neglect on the part of the defendants in making the plans, drawings, specifications and detailed statements.

These averments were admitted by the defendants, and were not litigated on the trial. The complaint further alleges the furnishing of the plans by the defendants and the payment of the agreed price, and that the plaintiff's assignor constructed the building according to the plans, specifications, drawings and detailed statements furnished, and followed the directions given therein; and that they were faulty to such an extent as to cause damage to the plaintiff's assignor to the amount of $2,261, for which plaintiff has recovered judgment. The defendants put in issue the truth of these allegations by a general denial. To succeed, the plaintiff was, therefore, required to affirmatively establish two material facts: 1st. That his assignor had followed the plans, specifications and

drawings in the construction of the building in all essential matters; and 2nd. That the plans were defective; and unless there was sufficient evidence to go to the jury upon both of these issues, the judgment which he has recovered cannot stand.

The sole defect complained of was in the plan of the proscenium arch. This opening was in the form of a segmental arch, as it is called in architecture, thirty-six feet long, with a rise of eight feet. It was built of brick, and when the cradle, which supported it, was removed, it fell in and had to be reconstructed, and the cost of rebuilding it and of repairing the injury done to other parts of the structure by its fall, constituted the amount of the plaintiff's recovery. The particular fault which the plaintiff alleged in his complaint was the omission by the defendants in the plans and drawings of what is known as a blind arch over the segmental arch, and that by reason of this omission no such blind arch was constructed, and in consequence thereof the wall fell. The plaintiff was permitted to give evidence upon the trial, against objection, tending to show that the fall of the arch might have been occasioned because it was too flat; that a rise of eight feet in an arch of that width was insufficient to give it the necessary spring for self-support, and that the arch was so planned and constructed that the thrust of the arch did not fall within the abutments upon which it rested, but outside of them, and that this may have been the cause of its ruin; and also that its destruction might have been due to the use of lime mortar instead of cement; but this latter evidence was not objected to, as the defendants claim that the specifications require cement, and that, therefore, the failure to use it would defeat the plaintiff's cause of action.

We need not review the exceptions to the admissibility of evidence, or those based upon a variance between the pleadings and proof, for we think the plaintiff's complaint should have been dismissed upon the ground of a failure to prove that the arch was built in substantial compliance with the plans and specifications furnished by the defendants. The

plan of the arch was separate from the plans of the other parts of the building, and required that stone skewbacks should be put in at each heel for it to rest upon at the points where the arch meets the abutments. These were designed to be each of solid stone the thickness of the wall, and seventeen inches in width, and twenty-six inches the other way, and weighing seven or eight hundred pounds, and their office was to furnish a firm foundation for the arch, and distribute its thrust over a larger area of the abutments. The senior member of the defendants' firm was an architect of forty-five years experience, and it was shown that he had made a specialty of the preparation of plans for theaters and opera houses; that he had drawn such plans for many of the principal theaters in all of the large cities of the country; from seventy-five to one hundred of them; that in more than twenty of them he had put in segmental arches, having no greater rise than this one, without difficulty; that a ratio of the height to the length of an arch of one to six was regarded as safe, while in this case the ratio was one to four and three-fourths; that he always provided in every such plan for stone skewbacks; that he considered them of vital importance for the strength and stability of the structure. The utility and necessity of these supports cannot be questioned, for they sufficiently appear from the evidence of plaintiff's witnesses. His superintendent and builder, who was responsible for the omission to put them in, testified that the whole weight of the arch rested upon the skewbacks; that the thrust of the arch in this case equalled 122,000 pounds; that its direction was in a line right through the center of the skewbacks, and that this weight must be counteracted by the abutments or the arch would fall; that the burden of the mass of masonry composing the arch is distributed upon the two skewbacks substantially.

Another witness for the plaintiff, a skilled architect, says that he has always used a stone skewback where he constructed such work with quicklime; that it gives it more of an even bearing, and throws the thrust of the arch more upon a larger space of brick around it, and that he would not build such an

arch with quicklime without a stone skewback. Another architect, called by the plaintiff, stated that he preferred stone skewbacks; that he would not feel safe in building without them; that he wouldn't do it if he could get them; that it distributed the strength of the arch upon the abutments, and that is the purpose of putting them in, and that they produced a material effect and caused more local strength and greater stability, and that brick could not be made as effectual as stone for that purpose. Nine architects and builders were examined on the part of the defendants, who were unanimously of the opinion that skewbacks of stone were necessary to the proper construction of the arch. One of them says that in his own practice he should regard them as having an essential function to perform in the abutment to sustain the arch; if made of stone the surface would be perfectly true, smooth and uniform and of equal tenacity; brick that has been burned and then cut has not, and never can have, these properties; if made of brick it is only called a skewback by courtesy, and is made by cutting off, or breaking off, the brick irregularly with a trowel, or by sawing them off; it will not be as strong as though made in one piece, and a perfect surface is obtained from stone, which can never be got by cutting brick; this perfect surface is essential, because if this surface yields it results in the dropping of the arch in the center; a yielding of the skewback amounts to a yielding of the arch, and he would regard the failure to put in a stone skewback of vital importance in the building of this arch, and it would have a tendency to drop the arch by the compression of the smaller pieces of brick, which would result in weakening or cracking the wall above; and it would be more liable to fall.

Another witness, who had drawn the plans for twenty different theaters, and at least two of which had segmental arches as flat as this one, testified that he always put in stone skewbacks in order to distribute the thrust upon the abutments, and that the ratio of strength is one to four, that is, that they will support four times as much as a brick formation for that purpose.

Another witness testified that it was a very important feature

for any arch that a skewback should be of stone; that if of brick it would weaken it very materially, because every joint would be an element to induce compression at the most vital point of the arch, and a very slight compression at the skewback would be multiplied a great many times in weakening the arch at its haunches and crown. Another witness states that if the skewbacks were of brick there would be danger of their compressing or shifting, because the strain of each individual rowlock or section of the principal arch would be brought independently to bear upon an independent section of the skewback; one section might give, and that would relieve the supporting tendency of that portion of the arch, and would gradually force the piers apart, and the arch must necessarily fall.

Other testimony might be cited to the same effect; but these references to the record are sufficient to show the importance of this detail of the plan of the arch. Expert knowledge is scarcely required to establish so plain a proposition in the operation of physical laws.

There is also much proof in the record tending to show that the omission of the stone skewbacks was the primary cause of the falling of the arch. The first sign of weakness was a fracture in the brick work near the skewback on the south side. The plaintiff's assignor in a letter to defendants August 24, 1887, informed them that the week before his attention was called by the boss carpenter to an opening horizontally of the perpendicular joints in the brick near the skewback; that the next day the opening was larger, and he put stay rods of one and a half inch steel through from outside to outside; that the breaks are all in the perpendicular joints, and no evidence of crushing or other disturbances of the horizontal joints, and he adds, " There has evidently been a disturbance at or near the skewback of the arch, as the frame which supported the arch while building is crushed down at point ' B ' fully an inch." It is apparent that he had not then concluded that there was any inherent weakness in the arch resulting from its form, or because it was too flat, for he further states

that while the bricklayer insists that the arch is too flat, caus-
ing more outward pressure than the walls would support, his
superintendent and builder was non-committal, but said if he
were planning the building he would undoubtedly have put in
just such an arch.  When the arch fell one of the stay rods
was broken off close to the skewback, indicating that this
might be the point of greatest strain, and there was a crack
in the abutment running from the skewback on each side.

One of plaintiff's witnesses testified that the cracks, as
described to him, indicated a change in the direction towards
the skewback, where the weight of the brick was bearing upon
the arch.

Another witness testified that the cracks might be attributed
to one of several causes, and among them the crushing of the
skewback and the separating of the distances between the
skewbacks.

Another witness states that a compression in the joints of
the skewback which would vary its position would bring the
weakest points of the arch between three to six feet from the
skewback; the break would naturally take place at that point,
and a piece of the arch might still be attached to the skewback,
although the fault had been originally in the movement of the
skewback itself.

It appears from the plaintiff's evidence that the point here
described is the precise point where the break occurred.  The
defendant testified that one cause of the cracking of the arch
might have been the compression of the skewback, and in such
case the weakest point of the arch would be five or six feet
from the skewback where it first broke, and that a stone
skewback would have protected it.

The trial judge held that there was sufficient evidence to
support a finding that the arch fell on account of the omission
of the stone skewbacks, and he submitted that question to the
jury, with the instruction that if they so found the plaintiff
should not recover.  But we think it was error to submit this
question to the decision of the jury.  When it was conceded
that the plaintiff's assignor had not followed the plans in this

respect, and it appeared that the failure to put in the stone skewbacks may have caused the loss, which the plaintiff is seeking to impose upon the defendants, they were entitled to a ruling as a matter of law, that the plaintiff could not recover, and the complaint should have been dismissed. He had failed to establish a performance of the condition precedent, which was essential to the support of his cause of action. One of the principal allegations of the complaint had been left unproven. The action is ex contractu, and the defendants cannot be made liable upon a contract which they never assented to. There is no principle upon which a case of this kind can be excepted from the rule, so firmly established, that every stipulation which the parties have inserted in a contract by way of conditions to be performed is to be deemed material. (*Dauchey* v. *Drake*, 85 N. Y. 407; *Hill* v. *Blake*, 97 id. 216; *Tobias* v. *Lissberger*, 105 id. 404; *Bank of Montreal* v. *Recknagel*, 109 id. 482; *Clark* v. *Fry*, 121 id. 470; *Norrington* v. *Wright*, 115 U. S. 188; *Glaholm* v. *Hays*, 2 M. & G. 265.) The plaintiff's assignor was contracting for the exercise of the technical knowledge and skill of the defendants, and it was upon the infallibility of their own judgment that the defendants relied when they made their guaranty that if the arch was constructed in accordance with their directions it would stand. They regarded a stone skewback of vital importance for its security and stability, and their promise to make good any loss which might occur if it fell, was upon condition that this method of construction was adopted, and we are not permitted to say that they would have entered into the agreement had they known that these essential supports were to be omitted.

It is not necessary to hold that a literal performance of the condition was required. A variance, confessedly immaterial, or a departure from the plans in a separate and independent part of the building, having no structural relation to the defective member, would present a different case for our consideration. But where the variance is not disputed, and involves the integrity of the mode of construction of the

affected part, and is so far material that it may have been the direct cause of the injury for which the owner seeks to hold the architect responsible, it must be held, we think, that the plaintiff has failed to establish the cause of action upon which he relies.

The judgment must be reversed and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed.