### SANDERS *v.* KALAMAZOO TANK & SILO CO.

1. NEGLIGENCE—DEFECTIVE DERRICK—LIABILITY OF MANUFACTURER —BURDEN OF PROOF.

   In an action for injuries causing the death of plaintiff's decedent due to the collapse of a derrick manufactured by defendant, the burden was upon plaintiff to show a substantial compliance with the accompanying plans and instructions in the erection of the derrick.

2. SAME—EVIDENCE—DIRECTED VERDICT.

   Undisputed testimony that the instructions of the manu-facturer were not followed by deceased and his employer in assembling said derrick, *held*, to support a directed verdict for defendant.

3. SAME—CONTRIBUTORY NEGLIGENCE—ASSUMPTION OF RISK.

   Where decedent helped to construct the derrick knowing that the instructions for erecting had not been complied with, and continued to use it after it developed symptoms of weakness, *held*, to preclude recovery on the grounds of contributory negligence and assumption of risk.

Error to Kalamazoo; Weimer, J. Submitted January 29, 1919. (Docket No. 19.) Decided April 3, 1919.

Case by Myrtle M. Sanders, administratrix of the estate of Hiram E. Sanders, deceased, against the Kalamazoo Tank & Silo Company for the alleged negligent killing of plaintiff's decedent. Judgment for defendant *non obstante veredicto.* Plaintiff brings error. Affirmed.

*Charles H. Farrell,* for appellant.

*Jackson, Fitzgerald & Dalm,* for appellee.

STONE, J. The plaintiff, as administratrix of the estate of her deceased husband, Hiram E. Sanders, brings this action under the survival act of the State of Kansas, to recover damages for the injury and resulting death of her decedent caused by the collapse of a derrick or scaffolding on which he was working at the time, which was being used in constructing a tile silo, for one J. W. Tron, on June 3, 1915, in Mitchell county, State of Kansas. Mr. Tron, a contractor, had purchased the derrick directly from the manufacturer, the defendant company. Mr. Sanders died eleven hours after the injury, and as a result thereof. He was a mason by trade, was a strong, able-bodied, intelligent and industrious man, 52 years of age, and had followed his trade for about 15 years and had earned from $800 to $1,000 a year.

The derrick in question had a center pole made of one 20-foot piece of 4-inch gas pipe, and some 10-foot sections, and at the time of the accident the center pole was about 50 feet high which was held in a vertical position by four guy cables. Around the vertical pole were two collars held at a fixed distance from each other, by three rods with screw thread and nut adjustment. On each of these collars were 12 wings or flanges. To the flanges on the upper collar were bolted 12 pieces of angle iron, which were to form the joists of the derrick, and upon which the plank of the

platform was to be laid. These 12 joists radiated
from the center collar to the circumference of the silo
(which was round) and were supported in a hori-
zontal position by 12 other pieces of angle iron, which
extended from a point near the end of each joist to the
lower collar, to which they were bolted. These latter
braces—or struts, as they were technically called—
are shown by members numbered 6 and 7 on exhibit
"D," hereto attached. Both the joists and struts were

Exhibit "D."

two-piece members, arranged with bolts and symmet-
rical holes so that the length of the member could be
increased, or diminished to fit varying sizes of silos.

The whole contrivance was arranged to be raised on the vertical upright by means of a pulley and tackle, as the work on the silo wall advanced. To hold the derrick in a vertical position while a new section of the upright pole was being put in place, and the guy wires were consequently loosened, and also to help support the platform as the work of building the silo progressed, four shoe arms extended from the lower collar, as shown in exhibit "D," to the inside walls of the silo, where the arms terminated in large plank shoes held in position against the silo wall by small chains, which were attached to the ends of the joists above. This is a brief description of the so-called "Kalamazoo Erecting Derrick" shown in the exhibits in the record, upon which plaintiff's decedent and his son Lester E. Sanders were working on the morning of June 3, 1915, when suddenly two or three of the struts "buckled," and allowed the horizontal joists to fall, precipitating the two men to the bottom of the silo, a distance of about 35 feet—resulting as above stated.

Of the 150 derricks which the defendant had manufactured and sold, at the time of the trial, the derrick in question was the only one about which there had been any complaint relating to the parts breaking or giving away.

Mr. Tron had purchased the derrick from the defendant's agent at Kansas City, Missouri. Mr. Tron had the contract for building the silo. In setting up the derrick his directions were followed. He had before him printed directions, and the assembling diagram exhibit "D." The deceased read the instructions and he and his son assisted in assembling and erecting the derrick, after the foundation had been constructed, and the instructions and cut were referred to while the derrick was being erected. Upon this subject Mr. Tron, a witness for the plaintiff, testified:

"Mr. Sanders and I had this tally sheet and assembling diagram between us. I examined it and read it over. I understand that No. 12 in the diagram was the lower collar of the derrick as erected, and I also understand that No. 7 constituted the lower part of one of the braces that was to be fastened to No. 12. I did not understand that No. 8 in this exhibit was to be bolted to No. 9 and was then to be bolted to the collar marked No. 12. The bolts were too short to bolt these two pieces together. From the diagram it looked as though No. 8 was bolted on the collar and No. 7 onto brace No. 8. It looked that way on the diagram at the time we were putting up the derrick, but it could not be done that way. I did not put it on that way because I could not. The outer end of No. 8 was attached to No. 9, and that was attached to the shoe on the inside of the silo. As a matter of fact, instead of fastening it to the collar, as the direction showed, I fastened it up here at this point on the brace about 18 inches from the collar, about that far away from where the tally sheet, and the assembling diagram showed they should be fastened. At that time I knew that No. 8 was to be fastened to No. 9, and that there was a shoe on the end of No. 9 which was supposed to be slipped up tight against the inside of the silo wall for the purpose of furnishing support for the center pole. After we got the derrick assembled, there were four or five extra pieces of angle iron, in addition to those used.

"When the derrick was shipped to me, I was short eight pieces of angle iron, and I telephoned Kansas City, to the company's agent, and he finally shipped me some others, and he shipped me more than was needed, and for this reason there were four or five pieces left.

"It was impossible for me to attach the shoe rod to the lower collar as directed in exhibit 'D' because the bolts were too short to fasten the two pieces of iron to those wings on the collar. There were twelve of these wings on the collar, and there were twelve braces to go to them, so there were no wings left for these shoe rods. They had to be bolted through the braces to the wings and the bolts were not long enough. All of the bolts furnished were of the same length,

just long enough to bolt two pieces together. I did not know it was necessary to undertake to get any larger bolts to bolt No. 8 to the collar. I didn't attempt to get any. Larger bolts than I had, would have enabled me to bolt them together at that point and carried out the directions. Instead of that I took the shorter bolts and bolted it 18 inches up the braces. It would have only taken a bolt about an eighth of an inch longer."

The purpose of the shoes spoken of was to keep the center pole from weaving back and forth; there was a tendency for it to weave back and forth when the derrick got up 25 or 30 feet from the ground. The shoes would reach out from the side and stop the weaving. These shoes were kept against the sides of the silo except when moving the platform, and were used for tightening, and holding stiff the center pole. The derrick first showed signs of weakening when the deceased and his son got up to a point about 30 feet from the bottom of the pit; they then took some 2x6 timbers and braced them against the bottom of the pit, and angled them up against the center pole to help make the pole more rigid and stop the weaving to a certain extent.

In the use of the derrick and during the erection of the silo on which the deceased was working at the time of his injury, he discovered through one experience that these shoe arms, running from the shoes at the sides of the silo to the struts or braces, were causing the struts or braces to "buckle." The deceased and his son talked this situation over some time before the accident.

Prior to the accident one of the struts or braces had buckled or sprung in the same direction that this one did which buckled at the time of the accident, and it buckled toward the center pole. Previous to the morning of the accident, the witness Kennedy had a talk with deceased in regard to the derrick, and the latter

said he did not like to work on it; that he was "not stuck on this rigging." ˙ At the time of the accident the deceased and his son were on the platform of the derrick. The son weighed about 160 pounds, and the deceased from 170 to 175 pounds, and in addition there was a mortar board weighing perhaps 10 pounds. There were no tile upon the platform at the time.

The testimony produced by the plaintiff in the way of expert evidence as to how such a derrick should be constructed is largely covered by the testimony of the plaintiff's witness Elbert Nicholson. This witness testified, on direct examination, as follows:

"From an examination of these exhibits, I believe that the collapse of the machine on the 3d day of June, 1915, was due to the buckling of the lower part of the brace, was due to the fact that the strain placed upon it was larger than it could carry. In my opinion the strut or brace member was not strong enough to carry the load imposed upon it. That is my present opinion."

It was the plaintiff's claim that the collapse of the derrick was due to the fact that the braces, which were supposed to support the platform joists, were not made of material sufficiently strong to support the weight of the platform together with that of the men and materials necessary in order to use the derrick for the purpose for which it was advertised and sold; that the device was not constructed according to good engineering practice; that these defects were unknown to plaintiff's intestate, who had no means of ascertaining them; that defendant, while knowing, or being in a position to know that the device was unsafe, represented to plaintiff's intestate and others that it was built with a view to the safety of the "operator," and "all parties connected with or around the structure," and there was a good deal of expert testimony produced by the plaintiff upon these subjects.

On the other hand, it was defendant's claim, among other things, that the derrick was built of proper materials upon approved engineering lines, and that the reason for the collapse and consequent death of decedent was that the derrick had not been assembled according to directions furnished by the company (the manner in which deceased erected and used the derrick being illustrated by exhibit "I," hereto attached) ; and, further, that since the plaintiff's intestate assisted in assembling the derrick, he assumed whatever risk resulted therefrom. We quote further from the testimony of the plaintiff's witness Nicholson as follows:

"I understand that the center pole was stayed by those shoes that go to the side of the silo wall. I heard the testimony this morning, that there was a weaving there of about one and a half to two inches on each side of the center pole. Whether this weaving would have any effect, would depend upon where it took place. If the platform weaved back and forth to the center pole an inch and a half or two inches each side, as the testimony shows, it would have a tendency to throw the weight of this member against this brace and make it buckle. Whether it would cause it to break is a matter of speculation; it might, at least I should consider that it would weaken it enough to make it dangerous because of the light members used in the braces. It is so close to the limit of strength that any little thing like the dropping of a plank, or striking it, any little accident that might happen, might produce a strain. That is why I made the statement in regard to the use of heavier angle iron which might resist the strain that might be made upon it. * * * If the joist had been loaded just under the breaking point, the touch of a finger would have been enough to cause the brace to buckle. It would be like a trigger, it might go with the least provocation. If member No. 8 had been fastened down to the collar, it would not have had any effect in the way of causing the strut to buckle. I have examined the brace in member F-2 and they are both examples of buckling. If member No. 8 had been fastened to

Exhibit "I."

the lower collar any weaving of the platform one way .or the other would not have had any effect upon the brace. With No. 8 fastened to the brace 18 inches up from the collar, any weaving of the platform one way or the other would produce an added pressure at the point where it was attached, and the effect would be in proportion to the pressure; it might stand a little pressure and not buckle, but it would not stand a certain amount more. These conditions existing as shown in exhibits F-1 and F-2 would certainly tend to decrease the efficiency of that strut, if there was any pressure going to that strut through this brace; that is, if it came to it when the strut was holding a load and in action. If one thrust was up against the side of the silo and the derrick weaved from one side to the other, it would have a tendency to make a direct thrust against the brace through member No. 8."

The following occurred in the testimony of the plaintiff's witness Lester E. Sanders:

"*By the Court: Q.* I will ask you a question or two. Prior to the accident had any of those struts or braces, so-called, buckled or sprung in the same direction that this did at the time of the accident?

"*A.* One had.

"*Q.* Towards the center pole?

"*A.* Yes, sir."

At the close of the plaintiff's testimony, and also at the close of all the testimony, counsel for defendant moved for a directed verdict of no cause of action for many reasons, among which were the following:

(8) That under the testimony it appeared that the plaintiff's decedent and the owner of the derrick together knowingly erected the derrick in a way not in conformity with the printed instructions furnished for the erection of the same.

(9) That under the evidence it appeared that the derrick was not erected in conformity with the instructions and plans furnished by the defendant.

(10) That the plaintiff's decedent was guilty of contributory negligence.

(11) That the plaintiff's decedent assumed the risk.

(18) That under the testimony it appeared that the derrick was used by plaintiff's decedent, in a manner absolutely in violation of the plans and instructions furnished for its use.

Decision of the motion was reserved under the statute, and the case was submitted to the jury under a lengthy charge, and resulted in a verdict for the plaintiff for $5,000 damages. Later, upon the argument of the motion for a judgment for the defendant notwithstanding the verdict of the jury, a judgment was entered for the defendant. The court filed a written opinion in granting the motion in which, among other things, it said:

"At the close of the testimony the defendant made a motion for a directed verdict. Various grounds were assigned, among them being that it appeared from the testimony of the plaintiff's witnesses, Kennedy, Tron and Lester E. Sanders, that the deceased and others assembled the derrick, and in doing so failed to follow the instructions and plan furnished by the manufacturer; that they discussed the situation and decided to rely, and did rely upon their own judgment in preference to the judgment of the manufacturer; and that the manner in which they assembled the derrick caused the braces or struts, so-called, to bend and spring, and that the deceased commented upon this condition, and in substance expressed his doubt as to the efficiency of the machine; and that it conclusively appears that he had knowledge of the trouble which afterwards caused the derrick to collapse; and that the defect, no matter by what cause, was not hidden or concealed; and that the danger of using the derrick was not imminent, but was revealed to him, and that he assumed the risk involved therein. * * * In my opinion the motion should have been granted for the reasons urged by the defendant as herein set forth."

The plaintiff has brought error, and error is assigned upon the ground that the court erred in entering judgment for the defendant notwithstanding the verdict.

The position of the appellant in this court is that the evidence presented questions of fact which were properly submitted to the jury in the charge, and that the court could not say, as matter of law, that the plaintiff was not entitled to go to the jury upon the questions of the negligence of the defendant, and the claimed contributory negligence of the plaintiff; the position of the plaintiff being expressed tersely in this language:

"This court early laid down the rule that all reasonable minds must reach the same conclusion before negligence and contributory negligence will be treated as presenting questions of law exclusively"—citing *Detroit, etc., R. Co.* v. *Van Steinburg,* 17 Mich. 99; *Scharman* v. *Bridge Commission,* 158 Mich. 77; *Amanta* v. *Railroad Co.,* 177 Mich. 280; *Beach* v. *City of St. Joseph,* 192 Mich. 296, and other authorities.

These cases are readily distinguished from the instant case.

It is contended by counsel for the defendant that from the testimony we have quoted, and much other testimony in the record, it appears uncontradicted that the witness Tron knowingly and deliberately violated the instructions given by the manufacturer, or defendant herein, for the erection of the derrick in question; that he knew these shoe arms to which were attached the shoes that were to be placed against the inside of the silo, were also to be fastened to the lower collar, No. 12 on the center pole; that the purpose of this connection was to furnish a support from the inside of the silo wall to the center pole, and keep the same steady; that with such knowledge, and to meet his immediate convenience, he undertook a different manner of use of these shoe arms and fastened them to the struts or braces supporting the joists on which the platform was laid; that the owner of the derrick at least took upon himself, deliberately and knowingly,

the responsibility for this manner of assembling the derrick. It is claimed that the record is clear that his conduct and the connection made between these shoe arms and the struts, had to do with the ultimate collapse of the derrick; and that in this matter the deceased took a part and had equal knowledge with that of the witness Tron. It appears undisputed, we think, in this record, that the collapse of the platform was caused by the buckling of one or more of the struts or braces, and that the particular strut or brace which buckled was one which had attached to it a shoe member.

When Mr. Tron found that he did not have bolts of a sufficient length, it was his duty to obtain the same, or at least to ask the defendant for them, as he had asked for and received the angle iron. As he says,

"Larger bolts than I had would have enabled me to bolt them together at that point and carried out the directions. Instead of that I took the shorter bolts and bolted it 18 inches up the braces. It would only have taken a bolt about an eighth of an inch longer."

In the recent case of *Bayne* v. *Everham,* 197 Mich. 181, we had occasion to pass upon a question quite like the one here involved. We there held that a collapsed building not constructed according to the plans and specifications—one not actually or substantially built according to the design—furnished no foundation for a recovery against an engineer or architect. There was in that case convincing evidence that the plans and specifications were deviated from in respects which were of necessity vital; and we said that an engineer or architect cannot be held responsible for the collapse of the building, unless the plans have been substantially followed; and that where the plans had been deviated from in material and vital respects which might, and probably did cause the collapse, it was fatal to a recovery. In that case we quoted at length

from *Lake* v. *McElfatrick*, 139 N. Y. 349 (34 N. E. 922). The court of appeals there held, that when it appeared that the structure was not built in substantial compliance with the plans and specifications furnished by the defendants, that the plaintiff's case should have been dismissed; and said:

"Where the variance is not disputed, and involves the integrity of the mode of construction of the affected part, and is so far material that it may have been the direct cause of the injury for which" recovery is sought, "it must be held, we think, that the plaintiff has failed to establish the cause of action upon which he relies."

One cannot read this record without being of the opinion that had the instructions, especially the assembling diagram as shown in exhibit "D," been followed and complied with, in all probability this deplorable accident would not have happened. We think the duty and burden were placed upon the plaintiff to show a substantial compliance with the plans and instructions accompanying the derrick when it was purchased, and that burden has not been sustained; and that when that lack of conformity is traced to the knowledge of the decedent, as it was in this case, the plaintiff is in no position to recover a judgment for damages.

We think the conclusion reached by the court below was a proper one, and the judgment of the circuit court is affirmed.

BIRD, C. J., and OSTRANDER, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.