[No. 34732. Department Two. June 18, 1959.]

A. T. FOSSUM *et al.*, *Respondents*, v. TIMBER STRUCTURES, INC., *Appellant.*[1]

[1]Reported in 341 P. (2d) 157.

320

*Karr, Tuttle & Campbell, Clarence H. Campbell,* and *Bertil A. Granberg,* for appellant.

*W. L. Gibbon, Kahin, Carmody & Horswill,* and *Pinckney M. Rohrback,* for respondents.

DONWORTH, J.—Respondents, A. T. Fossum and Martin Fossum, copartners, doing business as Fossum Orchards, commenced this action to recover damages sustained by them through the collapse, on January 15, 1956, of an apple warehouse which they built near Yakima in the summer of 1955.

In view of the complicated nature of the subject matter involved in this appeal, we shall quote the trial court's

instruction No. 2, which fairly summarizes the difficult questions presented.

"You Are Instructed that in this case, the plaintiffs A. T. Fossum and Martin Fossum, as partners, doing business under the name of 'Fossum Orchards', seek to recover against the defendants on two theories or causes of action.

"Plaintiffs' first cause, or claim of action is based on breach of contract. The second cause of action of the plaintiffs is based on alleged negligent acts.

"In their first cause of action, the plaintiffs allege that they made a written contract with the defendant Timber Structures, Inc. They allege that that contract was entitled a 'Sales Order' and by its terms the defendant agreed to design certain bowstring trusses for the proposed apple warehouse which plaintiffs desired to build, and in addition, this defendant was to furnish the material for such trusses, manufacture them, and erect them on the premises of the plaintiffs. Plaintiffs further allege that said contract specified that 'lumber grades are to be in accordance with Par. 204 or better per WCLA Rules No. 14.'

"Plaintiffs also allege that at the time of making the contract with defendant Timber Structures, they made known to the defendant their special need and purpose in ordering roof trusses, and that they relied on Timber Structures, Inc. to furnish roof trusses suitable for their special need and purpose, and that the trusses failed to meet this special need and purpose, and that plaintiffs gave them timely notice of the failure of the trusses and the collapse of the warehouse. All of these allegations are denied by the defendant.

"Defendant Timber Structures, Inc. admits that it entered into a contract with the plaintiffs for the work claimed and admits that the contract specified the lumber grades to be used.

"Plaintiffs further allege that in attempting to perform pursuant to the contract, Timber Structures, Inc. also breached the contract in that several members of the trusses furnished by Timber Structures, Inc. contained diagonal and spiral grain much in excess of the slope permissible pursuant to said Paragraph 204 of said West Coast Lumber Association Rule No. 14 and several members of said trusses contained group knots in violation of said paragraph. This allegation is denied by Timber Structures, Inc.

"Plaintiffs further allege that on January 15, 1956, their

warehouse in which the trusses had been erected, collapsed and that a contributing cause of the collapse was the defective material contained in these trusses. The defendants admit the collapse, but deny that their trusses were a contributing cause to it.

"Plaintiffs further allege that as a result of the collapse of the warehouse, they incurred the following damages:

| | |
|---|---:|
| "A. Warehouse reconstruction costs | $49,586.25 |
| "B. Salvage Costs | 19,719.40 |
| "C. Apples and container losses | 37,923.58 |
| "D. Costs of other losses | 7,824.17 |
| "E. Packing and Sales Revenue lost | 15,000.00 |
| Total | 130,053.40 |

"The defendant denies the allegations of damage.

"For their Second Cause of Action, the plaintiffs allege that they entered into an oral contract with defendant Kent 'Champ' Sanford, whereby this defendant agreed to design an apple warehouse for the plaintiffs and that Sanford attempted to perform pursuant to this contract and designed the warehouse. Plaintiffs further allege that they made a written contract with defendant Timber Structures, Inc. to design, manufacture and erect the roof trusses for the warehouse. Plaintiffs further allege that they entered into a written contract with defendant Nettleship whereby that defendant agreed to complete the roof structure of the warehouse.

"Plaintiffs further allege in this cause of action, that the roof of their warehouse collapsed due to the following defects and omissions in design and the following failure to conform with good construction practices:

"1. Sanford failed to design the bond beams of steel reinforced concrete running horizontally through the concrete block wall to withstand the pressure exerted against them that was to be reasonably anticipated;

"2. Sanford failed to design the reinforcing pilasters to withstand the roof load that was to be reasonably anticipated;

"3. Sanford failed to design adequate lateral support at the top of the supporting pilasters on the two ends of the buildings, and failed to show construction details on his design of the lateral supports he specified between trusses and walls;

"4. Sanford failed to design details of joist and sheathing construction;

"5. Sanford failed to design details showing the method by which the joists at the ends of the building would be attached to the truss and to the wall;

"6. Timber Structures failed to design the trusses to withstand the loads they knew or should have known would exist;

"7. Timber Structures erected only three struts between end trusses and the end wall instead of four, and constructed the struts from material with inadequate dimensions;

"8. Timber Structures negligently selected the lumber to be used in fabricating the truss members;

"9. Nettleship applied the roof sheathing at right angles to the joists instead of diagonally;

"10. Nettleship failed to anchor the roof to the walls with solid blocking at the plates and anchor strips;

"11. Nettleship failed to properly place the end joists, in that the ends of said joists were notched at their point of bearing on the truss, and no ledger underneath was provided to compensate for the weakening of the joist. Likewise, the end joists were not adequately secured to the top of the end walls; and

"12. Nettleship failed to lap or 'scab' the joists at their point of bearing on the trusses.

"Plaintiffs further allege that by reason of the collapse they were damaged in the same amount as set forth in the allegations to the first cause of action.

"The plaintiffs have taken a voluntary non-suit against the defendants Sanford and Nettleship, and these defendants have been dismissed from this case.

"Defendant Timber Structures, Inc. admits by its answer that it entered into a written contract with the plaintiffs and admits that the collapse of the warehouse was caused or contributed to by the defects, omissions and failures claimed as numbers 1, 2, 3, 4, 5, 10, 11, 12 and 9 but alleges that said defects and omissions were not the responsibility of Sanford or Nettleship but instead were the responsibility of the plaintiffs who planned and designed the warehouse and specified the type and manner of construction to be used, although they well knew at the time that the type of design and construction was inadequate for the purpose they intended to use said building.

"The defendant denies the items and amount of damage alleged by the plaintiffs.

"Defendant Timber Structures, Inc. in its answer alleges as a First Affirmative Defense that the plaintiffs constructed their own building, acting as their own contractor and engaging several subcontractors. That the building was constructed according to the design, plans, and specifications as determined by the plaintiffs and that if the building collapsed, it was due to the negligence of the plaintiffs in the following particulars:

"1. That the plaintiffs in attempting to save money in the construction of said building, constructed the same using poor workmanship and materials, and provided construction standards and specifications which the plaintiffs were advised by competent persons were inadequate for the purposes intended. That plaintiffs failed to comply with certain of the construction specifications supplied to them, which failure materially weakened the plaintiffs' building and caused or contributed to cause its subsequent collapse.

"2. That the plaintiffs failed to timely remove the snow from the roof of the building prior to its collapse and permitted the roof of said building to become loaded with snow to an amount greater than the load which the roof was designed to safely carry.

"3. That the plaintiffs in attempting to remove the snow load from said roof on January 15, 1956, did so in an improper manner. That in removing the snow from the roof of said building on January 15, 1956, the plaintiffs attempted to do so by washing the snow off said roof and in so doing, added greatly to the weight of the ice, snow and water on said roof.

"4. That in constructing the pilasters supporting the roof load the plaintiffs failed to use proper cement or to pour the same in a proper manner or to properly anchor the supporting rods therein.

"5. That plaintiffs failed to properly construct the bond beams and failed to follow the specifications supplied to plaintiffs for their construction.

"Defendant Timber Structures, Inc. allege as a Second Affirmative Defense that the plaintiffs by accepting the trusses supplied by it waived any defects which might have existed therein.

"Plaintiffs in their reply deny all the allegations of the answer of defendant Timber Structures, Inc."

The case was tried before a jury. The trial consumed four weeks. Numerous engineers and other expert witnesses

testified as to the cause of the collapse of the warehouse. Their opinions were in sharp conflict. Some eighty-four exhibits were admitted in evidence.

Appellant moved for a dismissal of the action at the conclusion of respondents' opening statement, which motion was denied. At the completion of their case in chief, respondents took a voluntary nonsuit as to defendant Nettleship and, shortly thereafter, respondents also took a voluntary nonsuit as to defendant Sanford.

Thereafter, the case proceeded against the appellant as the sole defendant, and at the conclusion of the reception of evidence appellant moved for a directed verdict, which motion was denied by the court.

The court submitted the case to the jury with instructions covering each of respondents' claims and each of appellant's defenses. The jury returned a verdict for respondents and, in answer to special interrogatories, it found for respondents on all three claims of liability. No error is assigned to the amount of the verdict, which was in the sum of $88,530.

Appellant's alternative motions for judgment notwithstanding the verdict and for a new trial were denied following argument, and judgment for respondent was entered on the verdict; whereupon this appeal was perfected.

The facts giving rise to this controversy may be summarized as follows:

Respondents have been fruit growers in the Yakima Valley for many years. They desired to build near their orchards a cold storage warehouse for apples similar in appearance to other such warehouses in the area. This consisted of cement block walls surrounding a concrete floor slab with a rounded roof supported by "bow string" timber trusses. A designer was selected to prepare working plans of everything except the trusses. The design of the trusses was to be made by the company which sold and erected them. Various contractors were selected to construct different portions of the warehouse, except the installation

of the footings, which was done by a builder and carpenters who were hired by respondents on a daily wage basis.·

On February 11, 1955, A. T. Fossum contacted the Seattle office of appellant to inquire concerning the purchase of roofing trusses to be designed, fabricated, and erected in place. He spoke to William Brosy, who was appellant's sales representative for western Washington and Alaska, and asked for a quotation of price. Exactly what transpired at this meeting, as well as many of the subsequent facts, is substantially in dispute. However, since the case was submitted to the jury on three separate claims or bases of action, and since the jury, in answer to the three special interrogations, found in favor of respondents, we shall accept respondents' version of the facts for the purposes of our discussion.

Respondent A. T. Fossum requested from Brosy a quotation on trusses strong enough to hold any snow load which could be expected for the Yakima area. He advised Brosy that refrigeration units were to be hung from the trusses, but at that time it had not yet been determined whether there would be two large refrigeration units suspended from the center of the trusses or several small refrigeration units spread among the five trusses to be installed. Brosy replied that he was familiar with the area and with snow loads inasmuch as his company had built trusses for Alaska, and estimated that respondents would need a truss designed for seventeen pounds dead load and twenty-five pounds live load, and quoted a price of $3,339 for the design, fabrication, and erection of such trusses.

Brosy explained that dead load is the weight of the roof plus the weight of anything suspended therefrom which must be supported by the trusses. Live load is any weight temporarily superimposed on the roof. Brosy further indicated that twenty-five pounds live load would be sufficient in view of the safety factor of four which his company built into its trusses, which Fossum understood to mean that they could hold one hundred pounds of snow.

Thereafter, Brosy referred the matter to Jeff Miller,

appellant's Spokane sales representative, who subsequently came to Yakima and secured respondents' order.

A sales order was then prepared by appellant's home office in Portland, Oregon, and forwarded to respondents for their acceptance. The sales order was identical with the original quotation given by Brosy, except that the "dead load" figure was reduced from seventeen to fifteen pounds. Respondents did not question this change but merely signed the order and mailed it back as requested.

Accompanying the sales order, or shortly thereafter, plans of the proposed trusses were mailed to respondents. These plans called for a ten pound dead load, which apparently is the standard plan loading for a truss when no insulation or bottom sheathing is applied to a roof. Respondents' warehouse had both insulation and bottom sheathing, which increased the actual dead load to seventeen pounds exclusive of any refrigeration units. It further appears that Brosy knew of the insulation and bottom sheathing when he made the original computation of loads.

Respondents took the truss plans to their designer, Kent Sanford, who made certain corrections as to length and marked other suggestions on the plans in red pencil and then mailed them back to appellant. Thereafter, a sales change order was mailed to respondents which showed an increase in the price by $100, and listed the "dead load" factor as ten pounds, which agreed with the plans. Evidently, the increase in price and the further revision of the "dead load" factor to ten pounds was the result of the completion of respondents' refrigeration plans which called for two large refrigeration units to be suspended from two of the trusses instead of several smaller units distributed among all five trusses.

After respondents returned the sales change order and approved the plans as corrected, appellant proceeded to fabricate the trusses and, upon completion, delivered the fabricated pieces to respondents' warehouse site by truck. Appellant then proceeded to erect the trusses in place. As erected, each truss consisted of a curved upper chord and

a straight lower chord tied together with various web members. The chords themselves consisted of two rows of overlapping timbers joined together so that the joints in each row were placed opposite the middle of a piece of lumber in the adjoining row. In this way, each row of timbers served to overlap the joints in the other row.

After the roof trusses had been installed by appellant, respondents began to put on the roof joists and sheathing with their own employees. However, it soon became apparent to respondents that they lacked sufficient experience for this job, so they then employed defendant Nettleship to install the roof joists and sheathing.

Respondents completed their warehouse in the fall of 1955 and proceeded to use it for storage of their own apple crop and that of other farmers.

During the winter months the snow accumulated on the warehouse roof. Records show that the Yakima area received more snow in the winter of 1955-56 than had ever been recorded before. By January 13, 1956, the snow depth on the roof was twenty to twenty-two inches and respondents began to remove it. Both respondents and two of their employees were up on the roof on Sunday, January 15, 1956, when the collapse of the roof occurred. The method of removal was to cut small squares of snow with snow shovels and then wash or float blocks of snow off the roof by means of water from a fire hose. A strip of fifteen to twenty feet was removed in this fashion along the entire length of the building. Removal of a second strip had proceeded about twenty feet from one corner of the building when respondents and their employees heard a noise and felt a movement of the roof, indicating that it was starting to collapse, whereupon all of them promptly got off the roof. The roof and two walls collapsed in a matter of a few minutes.

The snow on the warehouse roof was later found to weigh up to a maximum of thirty-five to thirty-eight pounds per square foot. Two of the engineers, who testified as experts, expressed the opinion that the building collapse was a re-

sult of the failure of the trusses under the load they were then carrying. In looking over the broken pieces of lumber, these witnesses saw ten pieces which were not up to the grade specified in the contract, but they could not ascertain which piece was the first to break.

After the collapse, efforts were made to salvage the fruit inside the building, and in due course the debris was removed and the building reconstructed.

Appellants assign as error: (1) The failure to grant a motion for dismissal at the conclusion of respondents' case in chief; (2) the failure to grant a directed verdict at the conclusion of the evidence; (3) the giving of instructions numbered 11, 12, 13, 20, 22, and 24; and (4) the failure to give appellant's requested instructions; (5) in failing to grant appellant's motion for judgment n.o.v. or, in the alternative, for a new trial; (6) in admitting evidence of negotiations between the parties prior to their written contract for the purpose of varying appellant's obligation to respondents.

We need not concern ourselves with appellant's first assignment of error, because it was waived by appellant's failure to stand on its motion for a nonsuit and its presenting evidence in support of its defense. *System Tank Lines v. Dixon*, 47 Wn. (2d) 147, 286 P. (2d) 704 (1955).

Assignment of error No. 2, the trial court's failure to grant a directed verdict in appellant's favor at the conclusion of the evidence, and that portion of assignment of error No. 5 relating to the failure to grant appellant's motion for judgment n.o.v., must be considered in the light of well-established rules for reviewing such motions. In *Bleyhl v. Tea Garden Products Co.*, 30 Wn. (2d) 447, 191 P. (2d) 851 (1948), this court said:

"We have repeatedly held that such motions admit the truth of the evidence of the party against whom the motion is made and all inferences that reasonably can be drawn therefrom, and require that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. . . .

"Another rule as definitely settled is that, in a judicial

ruling upon any of such motions, no element of discretion is involved, and the motion can be granted only when it can be held as a matter of law that there is no evidence nor reasonable inference from evidence to sustain a verdict for the opposing party. . . ."

With these rules before us, we shall now consider appellant's contentions relating to the two assignments above referred to which, if sustained, would require a dismissal of this action.

It is first alleged that respondents materially deviated from appellant's plans in constructing the warehouse roof in that they failed to provide the trusses with proper lateral support. The roof was constructed in such a manner that 2 by 12 joists twenty feet long were laid on edge twenty-four inches apart and butted end to end on top of the trusses. The joists were attached to the trusses by means of toe-nailing (driving a nail slantwise through the bottom side of the eave). To support insulation placed between the joists, a 5/16-inch layer of plywood sheathing or membrane was nailed to the underside of the joists so as to butt directly up against the sides of the trusses. A 1 by 8 roof sheathing was placed on top of the joists at right angles to the joists. An asphalt and tar paper covering was thereafter placed on top of the roof sheathing.

There was evidence in the case that the toenailing of the joists to the trusses was done with nails which were smaller in diameter than standard size nails, that in one section of the roof there were eight joists in a row in which no nails were used, that there were other places where only one or two nails had been used.

Appellant's truss plans contained two notations with which, it is charged, respondents failed to comply. The first, "For proper lateral support all joists and/or sheathing shall be securely nailed to truss chords"; the second, "Joist to truss conn. [connection] to take lateral truss loads of 410 lbs. each."

It is to be noted that both notations are concerned with lateral support for the trusses. The necessity for providing such support is evident from the testimony elicited at the

trial. The top chord of a truss is analogous to a long, thin column in so far as its ability to support a heavy weight is concerned and, since it is under pressure from compression, it has a tendency to go out of line unless it is laterally supported. If rigid lateral support is not provided, an excessive load or stress might cause the top chord to buckle and thereby fail as a consequence.

The trial court's instruction No. 25 expressly informed the jury as to the requirements of the law in this respect:

". . . If plaintiffs have failed to follow defendant's plans substantially in respect of all material matters, they are not entitled to recover from defendant even though the change in the plans has not in your opinion affected the strength of the building or trusses. This is for the reason that what one person thinks is proper for a truss may not be considered proper by another person and the designer of a truss is not to be held liable for a method of construction which he has not approved. Any matter concerning the trusses is material if it concerns or has any relation to the strength of the trusses."

And again, by instruction No. 26, the jury was told:

". . . If plaintiffs have substantially departed from defendant's plans or failed to carry out defendant's instructions on its plans in any material respects, defendant has no liability to plaintiffs even though you should find against defendant in all other respects."

Appellant has not assigned error to either one of these instructions. Instead, it begins its argument with the premise that respondents must prove, as a condition precedent to any liability on the part of appellant, that they have followed appellant's plans. The following cases are cited as supporting appellant's position. *McGuire v. United Brotherhood of Carpenters & Joiners of America*, 50 Wn. (2d) 699, 314 P. (2d) 439 (1957); *Lake v. McElfatrick*, 139 N. Y. 349, 34 N. E. 922 (1893); *Bayne v. Everham*, 197 Mich. 181, 163 N. W. 1002 (1917); *Sanders v. Kalamazoo Tank & Silo Co.*, 205 Mich. 339, 171 N. W. 523 (1919).

Based upon this initial premise, appellant then complains that the joists were toenailed to the trusses, which is a noncompliance with the first notation on appellant's plans

which specifies *secure* nailing. In this connection, it is pointed out that all the experts who testified were of the opinion that "toenailing" was not *secure* nailing. It is asserted that respondents attempted to provide the lateral support required in the plans by the installation of the bottom plywood sheathing which was nailed to the joists and butted up against the sides of the trusses. Appellants therefore conclude that the trial court should have held, as a matter of law, that proper nailing of the roof joists to the trusses was a required condition of the contract, and that the substitution of a different method of giving strength to the trusses by the use of plywood sheathing constituted a material deviation, which relieved appellant of liability for collapse of the roof.

In all of the above cited cases, the evidence clearly showed that the plans and specifications were not followed, so that no question could properly be raised as to this point. In the case at bar, the question as to whether respondents had substantially complied with appellant's plans was one of fact, which was properly submitted to the jury for determination.

The first notation on the plans states that the nailing shall be *secure* (without defining the term *secure*). On cross-examination, respondents' expert witness, Mr. Hostmark, testified that the question of whether "toenailing" was secure nailing was a difficult one to answer "because what one man considers securely fastened is not another man's idea." He further stated, on cross-examination, that even though, in his opinion, toenailing of the joists was insufficient nailing, nevertheless:

"It has been the generally accepted practice except I know of failures of trusses that have failed on account of top chord buckling; that is why in our office we make particular note in the plans and not depend on the particular carpenter and his nailing."

However, on direct examination, Hostmark further qualified his answer with the following testimony:

"Yes, in addition, I mentioned in my opinion the nailing was not sufficient from the roof joist to the top chord but on

the bottom roof joists was a layer of plywood put there to hold the insulation and that plywood would be pushing against each side of the top chords and plywood forms one of the better known diaphragms, so, in spite of that shortness of fastening, it was still securely fastened to the plywood."

On cross-examination, Hostmark further stated:

"May I call attention to the fact they had plywood nailed on the under side of the joists and up against the chords and really held it securely even if there hadn't been any nails at all in the bottom of the joists."

There was evidence in the case which indicated that appellant's plans were prepared and designed for a standard type roof where there was no additional sheathing below the joists for insulation and where the only method of providing lateral support would be the nailing of the joists to the truss chords.

■ We think that there was sufficient expert testimony from which the jury could have found that, under the circumstances, "toenailing" was *secure* nailing within the meaning of the contract.

The second notation on the plans concerning the joist-to-truss connection (requiring that it be strong enough to provide 410 pounds lateral support) did not specify any particular method by which this result was to be achieved. Appellant argues that, in view of the first notation, it is clear that the required lateral support of 410 pounds pressure per joist connection was to be provided exclusively by nailing, and not by a combination of nailing and the use of plywood sheathing.

■ Appellant authored the language used in the plans. If it were intended that the required lateral support be provided solely by nailing, appellant should have said as much in its plans. In a case such as this, the court should construe the language most strongly against the party who used it. *Mikusch v. Beeman*, 110 Wash. 658, 188 Pac. 780 (1920).

In its brief, appellant states that the reason for inserting the two notations in the plans was to obtain rigid lateral

support, which it had found to be necessary in order that each joist attachment would be able to resist 410 pounds pressure. Thus, it would seem that if the joists were attached to the trusses in such a manner as to resist 410 pounds pressure, there would be substantial compliance with both of the notations in the plans.

Referring again to the testimony of Mr. Hostmark, on direct examination, we find the following question and answer:

". . . I want to ask you if in your knowledge, from this, in your opinion the joist to truss connection was sufficient to take lateral truss loads of 410 pounds each? A. They could take many times that, sir."

For the reasons stated above, it must be concluded that it was proper to submit the question of substantial compliance to the jury, and it cannot be said that there was no evidence, nor reasonable inference from evidence, to sustain a finding that there was substantial compliance with appellant's plans.

Appellant's second argument for dismissal is that there was no implied warranty that the trusses would be fit or suitable for the particular purpose required by respondents; therefore it was error for the trial court to give instruction No. 11.

The legislature of this state has adopted the uniform sales act, which is embodied in RCW 63.04. The trial court's instruction No. 11 quotes part of RCW 63.04.160, which pertains to implied warranties. Under RCW 63.04.160(1), there are two prerequisites to an implied warranty of fitness: First, the buyer must make known to the seller, expressly or by implication, the particular purpose for which the goods are required; and second, the buyer must rely upon the seller's skill and judgment when he purchases the goods. *Ringstad v. I. Magnin & Co.*, 39 Wn. (2d) 923, 239 P. (2d) 848 (1952).

There is evidence that respondents made known to appellant the purpose for which the trusses were desired. In referring to the original negotiations with respondent

A. T. Fossum, appellant's sales representative, William Brosy, testified: "He told me he wanted a truss designed for sufficient live load to take care of the snow load in this area."

As to the requirement of reliance, appellant points out that respondents submitted the truss plans to Sanford, their own designer, for suggestions before returning them to appellant. It is urged that this fact conclusively shows that respondents did not rely upon appellant's judgment as to the sufficiency of the loads specified for the trusses, and thus there could not have been an implied warranty of fitness. In support of its position, appellant quotes 46 Am. Jur., Sales, 532, § 348:

"As a general rule, notwithstanding goods are sold for a particular use, if the buyer himself understands what he wants and has a full opportunity to acquire a knowledge of any fact necessary to enable him to form a correct estimate, and selects such goods as he deems adapted to the intended use, there is no warranty of their fitness for such use. The existence or nonexistence of an implied warranty of fitness for a particular purpose must, and necessarily does, depend upon whether the buyer relied upon the skill or judgment of the seller; and this is a question of fact which is ordinarily to be determined by a jury under appropriate instructions."

Appellant then cites *W. & S. Job & Co. v. Heidritter Lbr. Co.*, 255 Fed. 311, 3 A. L. R. 619 (1918), as holding that, where the purchaser of a vessel bought it after he had employed a surveyor to examine it and had received a formal report from him as to the condition of the vessel, the rule of *caveat emptor* applied, and there was no implied warranty as to the seaworthy condition of the vessel.

We think the cited authorities are more favorable to respondents than to appellant. Sanford, respondents' designer, was retained for the purpose of designing the other portions of the warehouse, exclusive of the roof trusses, which were to be designed, fabricated, and erected by appellant. From the evidence, the jury could have believed that, in showing the truss plans to Sanford, respondents were merely assuring themselves that the trusses

would fit in with the over-all construction of the warehouse. An implied warranty of fitness may exist even though the buyer's reliance on the seller's skill and judgment is not a total reliance, and the buyer has relied on his own judgment as to some matters and on the seller as to other matters. *Drager v. Carlson Hybrid Corn Co.,* 244 Ia. 78, 56 N. W. (2d) 18 (1952).

It is next argued that the recommendation of size of a manufactured article does not give rise to an implied warranty of fitness for the obvious reason that where the purchaser is advised that he is buying an article of a specified size (size, in this instance, being stated in load capacity), it is the buyer's obligation to determine whether that size is large enough to suit his purposes. Appellant further asserts that if the purchaser desires a manufacturer to give an implied warranty, the purchaser may not specify the size by his order but must leave the entire selection to the judgment of the manufacturer.

This argument assumes that respondents specified the size truss to meet their needs and made their own selection rather than relying upon the judgment of appellant. From the evidence, the jury was entitled to believe that the entire selection of these trusses was left to appellant. The question of reliance was for the jury and was resolved in favor of respondents. It is not argued that there was no evidence upon which to predicate such a finding.

Appellant next cites *Caldwell Bros. & Co. v. Coast Coal Co.,* 58 Wash. 461, 108 Pac. 1075 (1910), and *Mianus Motor Works v. Vollans,* 83 Wash. 680, 145 Pac. 997 (1915), in support of the proposition that the furnishing of equipment pursuant to plans and specifications approved by the buyer does not give rise to an implied warranty of fitness.

It is to be noted that both of these cases were decided prior to the adoption of the uniform sales act by this state in 1925. Aside from this fact, the cases are further distinguishable from the one at bar. The *Caldwell* case did not even involve an implied warranty of fitness. This court

simply held that a contract to manufacture and sell "one 400-ton Howe coal washer," according to plans and specifications which designated it as a Howe coal washer, "Capacity 400-tons per day," was more in the nature of a trade name for the washer than a guaranty that such washer was capable of washing 400 tons of coal per day, and there was no breach of contract for want of such capacity, since the washer was made according to the specifications.

In the *Mianus* case, it appears that the buyer relied upon his own foreman. The case involved the construction of a hoist which was to have an engine mounted upon it. During the period of construction, the buyer's foreman made certain changes and additions which were not contained in the plans or specifications. In this respect, the opinion states: "The authority of the foreman is not denied." The machine proved to be unsatisfactory. We held that, under the undisputed facts of that case, it was not error for the trial court to grant a new trial because of the giving of an instruction to the effect that there was an implied warranty of fitness.

The present case falls within the rule stated in Williston on Sales (Rev. ed.) 604, § 235.

". . . The manufacturer, and in most jurisdictions the dealer, is sometimes held to warrant not simply that the goods he sells are fit for the general purpose for which they are manufactured or usually sold, but are fit also for some special purpose of the buyer's which will not be satisfied by mere fitness for the general purpose goods of that sort fulfill. The test here, as elsewhere, is whether the buyer justifiably relied upon the seller's judgment that the goods furnished would fulfill the desired purpose, or whether relying on his own judgment the buyer ordered or bought what is frequently called 'a known, described, and definite article.' "

In § 236 of the same treatise, it is stated:

". . . Where the buyer justifiably relies on the seller's skill and judgment to select goods, suitable for his purpose, a warranty of fitness will exist even if the goods which the seller selects are described and definite, unless the buyer knew or ought to have known the characteristics of such goods."

 We do not think that it can be seriously contended that respondents, who were in the business of growing and storing apples, ought to have known the characteristics of roof trusses in so far as their design or loading capacity is concerned.

Our attention is called to RCW 63.04.160 (6), which reads:

"An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

Appellant's position is that the contract expressly specified the weight the roof trusses were to hold, and that this fact negatives any implied warranty that the trusses would hold any greater weight. Cases from various jurisdictions are cited to the effect that an express warranty negatives an implied warranty which is inconsistent therewith.

 The fallacy of appellant's argument is that it overlooks the fact that its undertaking here was not limited to just the fabrication of trusses. It was also a contract to *design* trusses with load factors that would be sufficient to support the roof of this particular warehouse in the Yakima area. Under these circumstances, it cannot be said that an express warranty that the trusses would withstand a live load of twenty-five pounds and a dead load of ten pounds is inconsistent with an implied warranty that such load factors would be sufficient for respondents' purposes. Appellant's specific contention was answered by this court in *Long v. The Five-Hundred Co.*, 123 Wash. 347, 212 Pac. 559 (1923), wherein this court said:

" . . . The order here was not for a truck of a specific kind or manufacture, but was an order for a truck suitable for hauling saw logs and timber products. The appellant produced the particular truck and sold it to the respondents, knowing the purpose for which it was intended to be used. . . . In other words, there was here a sale of a particular article for a particular purpose, and the rule of implied warranty of fitness for the purpose is applicable."

Although the *Long* case, *supra*, was decided prior to the adoption of the uniform sales act in this state, it still represents the rule as to implied warranty of fitness. *Columbia*

*Concrete Pipe Co. v. Knowles,* 36 Wn. (2d) 602, 219 P. (2d) 557 (1950).

Appellant insists that its liability is limited or circumscribed by the written contract, and assigns error to the giving of instruction No. 24, which reads:

"Where various negotiations between two parties have resulted in a written contract between them, any previous or preliminary oral agreements or understandings between them relative to the same subject become merged in the written contract. Under such circumstances the rights and duties of the parties are determined solely by the written contract and not by, the previous oral agreements or understandings.

"This rule of law does not apply to plaintiffs' claim of a breach of implied warranty or negligence as referred to in other instructions."

Error is also assigned to the trial court's refusal to give appellant's supplemental proposed instruction No. 5, which, with the exception of the second paragraph, is identical with the above quoted instruction No. 24.

 Appellant's position ignores the very nature of an implied warranty. Such a warranty is an obligation which the law imposes without regard to any supposed agreement of the parties. It is neither promissory nor contractual in its nature. As stated in *Bekkevold v. Potts,* 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164 (1927):

"An implied warranty is not one of the contractual elements of an agreement. It is not one of the essential elements to be stated in the contract nor does its application or effective existence rest or depend upon the affirmative intention of the parties. It is a child of the law. . . ."

This fundamental distinction was recognized by this court in the *Long* case, *supra,* in answer to the same argument here made by appellant:

"The truck was sold on a contract of conditional sale, and a writing was entered into between the parties expressing the agreement, and stating the terms and conditions of the sale with respect to the payment of the purchase price and the remedy of the seller in case default was made therein. . . . The implied warranty of fitness in this instance

arose from the circumstances of the sale. It was entirely apart from the subject matter of the writing, which, as we have said, related only to the terms of the sale and the remedies for a breach of the terms. It was not error, therefore, to permit a showing of the entire transaction, nor error to draw the legal conclusions obviously arising from the evidence as a whole."

Thus, the parol evidence rule has no proper application to the evidence here bearing on the presence of a warranty independently imposed by law. The written contract of the parties still stands as the unimpeached expression of the terms agreed to by the parties, even though the legal effect has been materially changed by the showing of additional facts and circumstances which may be properly considered in determining the respective obligations of the parties.

After our consideration of all appellant's assignments of error, we have concluded that the jury's finding of the existence of an implied warranty of fitness (being based upon substantial evidence which the jury had a right to believe) must stand. This finding, which was made in answer to an interrogatory submitted to the jury by the trial court, together with the verdict for respondents, adequately supports the judgment.

Those assignments not separately discussed herein either have been disposed of by what has already been said or are related to respondents' claims of recovery based on either express contract or negligent performance. In view of our disposition of the case, they require no further notice.

The judgment of the trial court, being based upon a jury verdict rendered after a trial conducted without reversible error, is hereby affirmed.

WEAVER, C. J., HILL, ROSELLINI, and FOSTER, JJ., concur.